UNITED STATES of America

v.

Carlo PINTO, Defendant.

Crim. No. 86–00015–B.

United States District Court,
D. Maine.

May 29, 1987.

Jay P. McCloskey, Asst. U.S. Atty., Bangor, Me., for plaintiff.

Sandra Collier, Ellsworth, Me., for defendant.

## MEMORANDUM AND ORDER

CYR, Chief Judge.

Defendant Carlo Pinto is charged with attempting to possess cocaine, with intent to distribute, in violation of 21 U.S.C. §§ 841(a)(1) & 846. Defendant moves to suppress statements made to a police officer on October 11, 1985, and physical evidence seized from defendant and from the vehicle in which he was a passenger.

## FACTS

On October 11, 1985, Detective Sergeant Michael Hall of the Brewer Police Department assisted in the execution of a war-

ranted search of a residence in Brewer, Maine, during which cocaine, cash and drug paraphernalia were found. While the search was being conducted, the telephone rang 25 or 30 times. Hall answered most of the calls. Most of the callers asked for "Butch." One caller, who identified himself as "Junior," called three times for "Butch." On the third call from "Junior," Hall said that he was "Butch," and asked the caller what he wanted. The caller replied "I need an eighth O Z. I have some green for you." The caller said that he was at a Chevron gas station in Brewer. Hall told the caller to wait there, and again asked how much the caller wanted, to which the caller replied "eighth ounce." Hall said he would be there in a few minutes.

Hall drove to the gas station in an unmarked police car, followed at some distance by a uniformed officer in a marked car. Nearing the gas station, Hall observed a car, with its parking lights on, in a parking lot next to the gas station. Hall stopped his vehicle behind the parked car. Defendant exited from the passenger side of the parked car and walked back toward Hall. Hall said: "Junior?" Defendant replied: "Yeah." Hall said: "I'm Mike Hall. Why don't you get in the car."

Hall and defendant got into Hall's car. As defendant sat down in the right front seat of the vehicle, he observed the police radio and instantly realized that he was in a police vehicle.

Hall identified himself as a police officer and told defendant that he was the person whom defendant had talked with on the phone earlier that evening. Defendant denied having made any phone call and said that he was just sitting in the parking lot "doing nothing."

At that point, Hall stated that he had enough information to charge defendant with attempting to traffic in narcotics.[1] Hall advised defendant to cooperate, telling him that he was the "one friend" that defendant had, and that he was the one person standing between defendant and a long jail term.[2] Hall then read defendant his *Miranda* rights.[3] Defendant did not request an attorney.

---

1. The parties' versions of what happened after defendant denied speaking with Hall on the phone differ sharply. Detective Hall and defendant were the only witnesses at the suppression hearing. The court has reviewed the hearing testimony carefully, as well as Government Exhibit 1 (the transcript of the police station interview). The court's findings as to these events are based on the demeanor of the witnesses as they testified, upon credibility determinations predicated on the court's consideration of the self-contradictory testimony of the witnesses, and upon a careful analysis of the police station interview tape transcript. With regard to what representations were made by Hall to defendant at the outset of the questioning in the police car, pertinent portions of the hearing transcript are set forth in the Appendix.

2. The court finds that these words, or words to this effect, were stated at this point in the conversation between Hall and defendant. Hall made similar statements on the record on two other occasions later in the questioning, *see* Police Station Transcript [PST] at 13, 26, and in the recorded statements Hall says either "Like I told you before," PST, at 13, or "Like I told you in the car I'm the one friend you've got," PST, at 26. The court also notes that Hall demonstrated a penchant for repeating certain phrases, *see, e.g.*, PST, at 25–26 ["the whole nine yards" is repeated four times].

3. Pursuant to *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), Hall read defendant the following statement:

> I'm a police officer. I caution you you have an absolute right to remain silent; that anything you say will be used in a court of law against you; that you have the right to the advice of a lawyer before and the presence of a lawyer here with you during questioning; and, that if you cannot afford a lawyer, one will be furnished to you free before any questioning, if you desire.

Hearing Transcript [HT], at 8.

Defendant testified that Hall read this warning after he had been advised to cooperate, after he had stated that he had contraband on his person and in the vehicle in which he had arrived, and immediately prior to getting out of the Hall vehicle to assist the officers in locating the tin box. Although Hall's testimony was inconsistent on the exact sequence of events, *see* Appendix, he testified consistently that he read the *Miranda* warnings either before or after he advised defendant to cooperate. *See* HT at 15, 22, 70–73. The court finds that defendant's testimony is not credible on this point, and that it is more likely that Hall would have advised defendant of his rights at about the same time that he stated he had enough evidence to charge him with a crime.

The testimony also is contradictory as to whether defendant expressly waived his *Mi-*

Hall next inquired whether defendant "had anything on him." Defendant removed an item of drug paraphernalia from his jacket[4] and handed it to Hall. Hall asked if there was any other drug paraphernalia in the car in which defendant had been sitting. Defendant stated that there was a tin box under the front seat.

While this conversation was taking place, less than a minute after defendant sat in Hall's car, the marked police car which had followed Hall to the Chevron station pulled into the parking lot next to Hall's car. The uniformed officer exited his vehicle and stood beside the passenger-side door of Hall's car.

Hall and the defendant got out of Hall's car and, with the uniformed officer, approached the car in which defendant had been sitting. Defendant assisted the officers in locating the tin box, which contained some rolling papers, razor blades, pipe cleaners, psychedelic mushrooms and other drug paraphernalia.

After the tin box had been located, a pat-down search was conducted while defendant leaned up against the fender of Hall's car. Defendant voluntarily emptied his pockets. After defendant had been searched, Hall drove him to the Brewer Police Station.

At the police station, defendant was brought to Hall's office. Hall explained that he was going to tape their conversation. Hall then turned on a tape recorder and interviewed defendant.[5] After obtaining some identifying information, the following colloquy occurred:

Q: [by Hall] I did advise you that I was a police officer when I met you up at Stacey's or the Plaza Chevron, is that right?

A: [by defendant] Yes.

Q: Okay, and I gave you your rights per Miranda?

A: Yes.

Q: You know what Miranda means; you have the right to remain silent and all that?

A: Yes.

Q: You understood all those?

A: Yes.

Q: And you are willing to talk to me now for cooperation purposes? To try to help your self [sic] out?

A: Yes.

---

*randa* rights. Hall testified that after he read defendant his rights from the front side of a card, he turned the card over and read two questions:

A. [By Hall, after reading the warning quoted above]
Number one: "Do you understand each of these rights I've explained to you," to which he stated, "Yes."
Number two, "having these rights in mind, do you wish to talk to us now without having a lawyer present?" He stated, "Yes."

HT, at 8. Defendant testified, however, that Hall only read the front side of the card, and did not ask the questions written on the back. HT, at 50, 63–64. It is unnecessary to resolve this conflict, as defendant undisputedly did not seek to exercise his *Miranda* rights during his interview with Hall.

The exact timing and content of the giving of the *Miranda* warning and any waiver by defendant would be critical *only* if the Government could prove, by a preponderance of the evidence, that defendant had received and waived his rights before, and completely apart from, any exhortation by Hall that cooperation was in defendant's best interests. The Government has not met its burden in this regard. Aside from the fact that Hall's testimony on this point is ambiguous and self-contradictory, *see, e.g.,* HT,

at 40, 70–73, and contradicted by defendant, there would have been no reason for Hall to "advise" defendant to cooperate, or intimidate or promise, if defendant already had agreed to do so.

4. Hall testified that defendant gave him a "pot pipe" from his jacket. HT, at 9. Defendant testified that he produced "a set of pot scales" in response to Hall's request. HT, at 47. The transcript of the police station interview suggests that at some point defendant also gave Hall a marijuana cigarette which had been on his person. *See* PST at 7 ["I smoke pot once in a while like you know that butt that you that I took out of my shirt. That was given to me today"]. Neither party has offered in evidence an inventory of items seized, and it is not necessary, for the purposes of the present motion, to determine precisely what was produced by defendant in response to Hall's request.

5. The tape of the interview inadvertently was put back into use and copied over. Defense counsel objected to the admission of the transcript, but then agreed that the transcript of the interview could be admitted as Hall's "best recollection" of his conversation with defendant. *See* HT, at 14–15.

Government's Exhibit 1, at 1 [hereinafter referred to as Police Station Transcript, or PST].

Hall then asked about the phone call to "Butch" and the transaction which the defendant was trying to arrange. Defendant admitted that he had been trying to purchase an "eight ball" of coke,[6] that he was trying to purchase cocaine for a friend so that he could make $30, and that he had made five or six other purchases from "Butch" in the past. *See* PST, at 2–5. Approximately the first quarter of the interview focused on events surrounding the telephone call to "Butch" and the aborted cocaine transaction. Hall then began a wider-ranging inquiry, about drug dealing at defendant's former place of employment, other sources of drugs and other dealings with "Butch." Approximately one-third of the way through the interview, Hall began pressing defendant for the identification of other persons who had supplied him with drugs. *See* PST, at 8–10. In questioning defendant about the mushrooms found in the tin box, Hall made the following statement:

Q: [by Hall] I don't think it is just a cas [sic] of someone just giving you the mushrooms. I think you probably bought them somewhere.

A: [by defendant] No I didn't.

Q: Well you know Junior it is not going to do any good to hide things cause I'm going to know.

A: I know. I understand that.

Q: *Like I told you before I'm in a position to help you. Nobody else is. I'm the one thing between you and going to jail for quite a while.* There was a mushroom factory down there in Belfast that got raided a while back. Do you remember that? Winterport, Belfast area. Percy Sargent, Johnson and some other people, they were involved in the Michael Cockran [sic] murder.

A: I heard about that on the news.

Q: There was a mushroom factory that they busted down there. You have some information on that, that is going to be a plus in your favor.

A: I swear I don't. Most of my time was dedicated to work.

PST, at 13 (emphasis added).

Hall asked about defendant's wife and children and defendant's living arrangements. After defendant said that neither he nor his wife was working, Hall remarked "Come up against some hard times, haven't you?" PST, at 15; *see* generally PST, at 14–16.

Later in the interview Hall focused on defendant's past dealings with "Butch," the amount of money involved, where transactions had taken place, and what the defendant had done with the drugs he had purchased. *See* PST, at 17–22. At the close of the interview, Hall pressed defendant for the names of other drug dealers:

Q: [by Hall] Okay you realize that you know, the things that I could charge you with is like compounding a felony, soliciting sale of coke and the whole nine yards. That is all a charge all in it self [sic]. I wasn't kidding you *when I was tell you about it.* You do realize that? Okay and the reason that you are talking to be [sic] right now is trying to help yourself out. I think that right now you are scared. That is quite obvious. I think that you have a lot of names that you just don't want to give out because you are scared. You are worried about your reputation, worried about word getting out that you did talk to me, the whole nine yards. But I also think that you should be able to come up with a few names for me. Alright, this is Friday[,] by Tuesday I want at least five names of known drug dealers. Okay and you do that and I will take care of this. Fair enough? Okay I will need names, address, [sic] what they deal in, where they deal—you know if they deal in a bar or if they deal out of the house, how contact is made and the whole nine yards. And as far as I am concerned this does not get back to them. It is between you and I [sic]. That stays with me.

A: [by defendant] Okay.

6. An "eight ball" is jargon for ⅛ of an ounce of cocaine.

Q: Alright if you don't come in Tuesday then the whole thing changes. You know I've got my end of the conversation on the phone, I've got the phone number that you gave to call back, I've got the whole nine yards. I've got the stuff out of [y]our car; so you know *there is no problem the case is made if I want to use it. I am more interested in helping you out. I know the position that you are in. You are married, you've got two kids, your getting invovled* [sic] *in the drug trade which maybe if what you tell me is true*

A: It is.

Q: [Y]ou are not heavy into it, then this may be enough to rock your boat and keep you out of it. You know it's too bad to take a guy that does have a record

A: It is the first time I ever been in a police station.

Q: So I think right now, *like I told you in the car I'm the one friend that you've got. The one guy that is going to be on your side to keep you out of jail.* So all the information you give me, the more you give me the better off you are going to be. Okay this tape stays with me, it doesn't go anywhere at this time. Okay we will shut the tape off.

PST, at 25–26 (emphasis added).

After the tape was turned off, defendant was allowed to leave the station. Defendant was not formally arrested. Defendant did not ask if he was free to leave during the encounter, nor did Hall advise defendant, at any time prior to the end of the interview, that he could leave. Although it is not precisely clear at what time the foregoing events occurred, Hall met defendant some time after dark on the evening of October 11. The encounter at the Chevron station took approximately ten minutes. There is no evidence as to how long defendant was at the police station. The typed transcript of the station interview is 26 pages long, and the tape was turned off on at least two occasions when Hall was interrupted. There is no evidence whether defendant ever did supply the names of five "known" drug dealers as requested by Hall.

Although defendant had appeared relaxed at the beginning of his encounter with Hall (as he walked to Hall's car), his demeanor changed when he got into Hall's vehicle. For the remainder of his meeting with Hall, defendant was both scared and cooperative. Hall, who is 6'1" tall and weighs 195 pounds, testified that he did not search defendant immediately after identifying himself as a police officer because, although he thought there was some danger inherent in a drug deal, he felt he could "control" defendant as he sat in the police car. Defendant is 25 years old, 5'7" tall, and weighed between 120 and 130 pounds on October 11, 1985.

Prior to the evening of October 11, 1985, defendant had never been arrested and had never been inside a police station. Defendant attended high school through the eleventh grade, never completed the requirements for a high school diploma, is able to read and write, and appears to be of average intelligence. Prior to October 11, 1985, defendant had worked as a house painter and banquet supervisor at a local hotel.

## DISCUSSION

Defendant's primary contention is that all of the statements he made to Hall are incompetent because the Government has not met its burden of proving, by a preponderance of the evidence, that the statements were voluntary. *See* Defendant's Post–Hearing Memorandum, at 1 (citing *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972)). The items seized from defendant must be suppressed as well, defendant asserts, as the fruits of his involuntary statements. Alternatively, defendant contends that the Government has not proven that he knowingly and intelligently waived his *Miranda* rights. Both arguments are predicated on defendant's contention that he was induced to cooperate with Hall by Hall's statements to the effect that defendant would not be prosecuted if he cooperated.

The Government contends that all that was said to defendant at the Chevron station was that it would be in defendant's best interest to cooperate. The Govern-

ment asserts that no promises of leniency or nonprosecution were made, if at all, until the very end of the police station interview, after defendant had made incriminating statements. Defendant was advised of and understood his *Miranda* rights, the Government argues, and thus any "words of comfort" offered by Hall were not sufficient to "overbear" defendant's will and negate the warning that his words would be used against him. Although the Government's post-hearing brief does not directly address defendant's assertion that there was no valid waiver of his *Miranda* rights, apparently the Government's position is that *Mirnda* warnings were not required in these circumstances:

> Despite defendant's testimony that he *thought* he was under arrest, Sgt. Hall's testimony demonstrates that there was [sic] no "restraints comparable to a formal arrest" here.
>
> . . . .
>
> Defendant was not formally arrested; he was asked whether he would accompany Hall to the police station; he was subjected only to a pat-down search; and he was never told that he could not leave. At most, the defendant was subjected to a brief *Terry* stop, after which he voluntarily turned over drug paraphernalia on his person and in his car and then agreed to participate in an interview at the police station.
>
> Although, in any event, *Miranda* warnings were given prior to Pinto's decision to waive his rights and answer questions, the absence of the restraints usually as-

sociated with a formal arrest further demonstrates that his decision to answer questions at the police station was voluntary.

Government Post–Hearing Memorandum, at 4–5 (citations omitted).

As previously indicated,[7] the court finds that, while they were in the police car and before defendant made any incriminating statement, Hall told defendant that it was in defendant's interest to talk with Hall because Hall was the only person who could keep defendant from going to jail. The critical issue is whether the totality of the circumstances surrounding the detention and interrogation of the defendant rendered his subsequent statements involuntary.[8]

The Supreme Court first considered the voluntariness of confessions induced by promises or threats in *Bram v. United States*, 168 U.S. 532, 18 S.Ct. 183, 42 L.Ed. 568 (1897). There the captain of an American vessel was murdered en route from Boston to South America. After the murder, the boat headed for Halifax, Nova Scotia. Shortly before arriving at Halifax, Seaman Charles Brown came under suspicion of the murder and was placed in irons. Seaman Brown in turn cast suspicion on Bram, the first mate and acting captain. Bram was then placed in irons. Upon arrival of the vessel in Halifax, Bram was interrogated by a Halifax Police detective. The interrogation was described by the Supreme Court:

---

**7.** *See* notes 1 & 2 *supra,* & APPENDIX, *infra.*

**8.** Because the court finds that defendant's statements were not voluntary, it is not necessary to consider defendant's alternative arguments based on the timing and waiver of his *Miranda* rights. *See also* note 3 *supra.* Although the voluntariness inquiry is the same in either the *Miranda* waiver context or the confession context, a threshold question in considering a waiver of *Miranda* rights is whether defendant was "in custody" and subject to treatment which entitled him to "the full panoply of protections prescribed by *Miranda.*" *Berkemer v. McCarty,* 468 U.S. 420, 440, 104 S.Ct. 3138, 3150, 82 L.Ed.2d 317 (1984). As the First Circuit recently has stated, the test for distinguishing between a *de facto* arrest and an investigatory stop is whether "a reasonable man in the suspect's posi-

tion" would have thought that he was under arrest. *See United States v. Quinn,* 815 F.2d 153, 159 (1st Cir.1987) (quoting *Berkemer,* 468 U.S. at 442, 104 S.Ct. at 3151). In contrast, the conditions under which interrogation takes place are but a part of the totality of the circumstances to be evaluated in assessing the voluntariness of a statement. Thus, regardless of whether defendant was "in custody," the determinative issue in this case is the voluntariness of defendant's statements, and the court declines to engage in the problematic exercise of determining whether defendant was "in custody." *See Bryant v. Vose,* 785 F.2d 364, 366 (1st Cir.1986) [court declines to decide whether defendant was in custody where resolution of case turns solely on voluntariness issue].

Nicholas Power, of Halifax ... [testified that] in consequence of a conversation with Charles Brown [the seaman], he made an examination of Bram, the defendant, in the witness's office, in the city hall at Halifax, when no one was present besides Bram and the witness. The witness testified that no threats were made in any way to Bram, nor any inducements held out to him.

"The witness was then asked: 'What did you say to him and he to you?'

"To this the defendant's counsel objected. The defendant's counsel was permitted to cross-examine the witness before the court ruled upon the objection, and the witness stated that the conversation took place in his office, where he had caused the defendant Bram to be brought by a police officer; that up to that time the defendant had been in the custody of the police authorities of Halifax, in the custody of the superintendent of police, John O'Sullivan; that the witness asked that the defendant should be brought to his office for the purpose of interviewing him; that at his office he stripped the defendant and examined his clothing, but not his pockets; that he told the defendant to submit to an examination, and that he searched him; that the defendant was then in custody and did everything the witness directed him to do; that the witness was then a police officer acting in his official capacity; that all this took place before the defendant had been examined before the United States consul, and that the witness did not know that the local authorities had at that time taken any action, but that the defendant was held for the United States—for the consul general of the United States.

"The witness answered questions by the court as follows:

"You say there was no inducement to him in the way of promise or expectation of advantage?

"A. Not any, your honor.

"Q. Held out?

"A. Not any, your honor.

"Q. Nor anything said, in the way of suggestion to him that he might suffer if he did not—that it might be worse for him?

"A. No, sir; not any.

"Q. So far as you were concerned, it was entirely voluntary?

"A. Voluntary, indeed.

"Q. No influence on your part exerted to persuade him one way or the other?

"A. None whatever, sir; none whatever.

"The defendant then renewed his objection to the question, ...

"The objection was overruled, and the defendant excepted, ... and the exceptions were allowed.

"The witness answered as follows:

"When Mr. Bram came into my ofice, I said to him: 'Bram, we are trying to unravel this horrible mystery.' I said: 'Your position is rather an awkward one. I have had Brown in this office and he made a statement that he saw you do the murder.' He said: 'He could not have seen me; where was he?' I said: 'He states he was at the wheel.' 'Well,' he said, 'he could not see me from there.' I said: 'Now, look here, Bram, I am satisfied that you killed the captain from all I have heard from Mr. Brown. But,' I said, 'some of us here think you could not have done all that crime alone. If you had an accomplice, you should say so, and not have the blame of his horrible crime on your own shoulders.' He said: 'Well, I think, and many others on board the ship think, that Brown is the murderer; but I don't know anything about it.' He was rather short in his replies.

"Q. Anything further said by either of you?

"A. No; there was nothing further said on that occasion.

*Bram,* 168 U.S. at 537–39, 18 S.Ct. at 184–85. On appeal, defendant asserted that his statements to Detective Power were inadmissible because it had not been shown that the statements were voluntary.

The Court stated that the "legal principle by which the admissibility of the confession of an accused person is to be determined" is that

a confession, in order to be admissible, must be free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence. . . . A confession can never be received in evidence where the prisoner has been influenced by any threat or promise; for the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if any degree of influence has been exerted.

*Id.* at 542–43, 18 S.Ct. at 186–87 (quoting 3 Russell on Crimes, (6th ed.) 478) [deletion in original].

The Court noted that—

the generic language of the [fifth] Amendment was but a crystallization of the doctrine as to confessions, well settled when the Amendment was adopted, and since expressed in the text writers and expounded by the adjudications, and hence . . . the statements on the subject by the text writers and adjudications but formulate the conceptions and commands of the amendment itself.

168 U.S. at 543, 18 S.Ct. at 187. The Court acknowledged that each case would turn on its own particular facts, but rejected the argument that the rule of law was "involved in obscurity and confusion":

The rule is not that in order to render a statement admissible *the proof* must be adequate to establish that the particular communications contained in a statement were voluntarily made, but it *must be sufficient to establish that the making of the statement was voluntary; that is to say, that* from the causes, which the law treats as legally sufficient to engender in the mind of the accused hope or fear in respect to the crime charged, *the accused was not involuntarily impelled to make a statement,* when but for the improper influences he would have remained silent.

*Id.* at 549, 18 S.Ct. at 189 (emphasis added).

The Court discussed the English and American case law relating to "causes" considered "legally sufficient" to engender hope or fear in the mind of the accused. The Court noted that in 1655 the English courts directed that prisoners be examined without oath, as "an examination under oath 'would be a species of duress and a violation of the maxim that no one is bound to incriminate himself.' " *Id.* at 550, 18 S.Ct. at 189 (citation omitted). Although an English magistrate could examine the accused without oath, the magistrate also was compelled, first by case law and then by statute, to inform the accused that the making of any statement was optional, because "the mere fact of the magistrate's taking the statement, even though unaccompanied with an oath, might, unless he was cautioned, operate upon the mind of the prisoner to impel him involuntarily to speak." *Id.* Even the admonition that what the accused said "would" be used against him was held by some courts "to be equivalent to saying that what the prisoner chose to say might be used in his favor at trial, and was a direct inducement to make a confession, rendering the statement incompetent as evidence." *Id.* at 551, 18 S.Ct. at 190. Subsequent cases overruled this doctrine, *see id.* at 553–54, 18 S.Ct. at 191 (citing cases), but distinguished between the case in which the accused is told that he may say nothing, but if he says something he should speak the truth, from the case in which the accused is told it would be "better" for him to speak the truth:

[W]here the admonition to speak the truth has been coupled with any expression importing that it would be better for him to do so, it has been held that the confession was not receivable,—the objectionable words being that it would be better to speak the truth, because they import that it would be better for him to say something.

. . . .

The true distinction . . . is, that it is left to the prisoner a matter of perfect indifference whether he should open his mouth or not.

*Id.* at 554, 18 S.Ct. at 191 (citation omitted).

The most recent English case cited by the *Bram* Court, *Reg. v. Thompson,* (1893)

2 Q.B. 12, held that a confession made after the accused had been told that it would be "the right thing ... to make a clean breast of it" was inadmissible because the statement tended to lead the prisoner "to believe it would be better for him to say something," and therefore the prosecution had not satisfactorily proved that the confession was free and voluntary. 168 U.S. at 556, 18 S.Ct. at 192.

The Court concluded its review of English case law with the observation that

it clearly appears that the rule as to confessions, by an accused, ... is in England to-day what it was prior to and at the adoption of the Fifth Amendment, and that whilst all the decided cases necessarily rest upon the state of facts which the cases considered, nevertheless the decisions as a whole afford a safe guide by which to ascertain whether in this case the confession was voluntary, since the facts here presented are strikingly like those considered in many of the English cases.

*Id.* at 557, 18 S.Ct. at 192.

The Court then reviewed American court decisions, noting that in state courts the rule that confessions must be voluntary was well settled. The Court also stated that "it has been settled that the mere fact that the confession was made to a police officer, while the accused was under arrest in or out of prison, or was drawn out by his questions, does not necessarily render the confession involuntary, but, *as one of the circumstances,* such imprisonment may be taken into account in determining whether or not the statements of the prisoner were voluntary." *Id.* at 558, 18 S.Ct. at 192 (citation omitted, emphasis added). The decisions of the state courts of last resort cited in *Bram* generally are in accord with the English authorities, holding that statements such as "the best thing you can do is to tell all about it," or "it will be better for you to make a full disclosure," were sufficient to render a confession involuntary. *See id.* at 559–60, 18 S.Ct. at 192–93 (citing and quoting *Kelly v. Alabama,* 72 Ala. 244 (1882), and *People v. Barrie,* 49 Cal. 342). *See generally* 168 U.S. at 559–61, 18 S.Ct.

at 193–94 (citing and quoting state court decisions).

The Court next considered the circumstances of Bram's interrogation. After noting that the questioning took place in a private office in a police station in a foreign city and that Bram was stripped of his clothing either during or prior to the questioning, the Court noted the nature of Bram's statements:

The fact, then, is, that the language of the accused, which was offered in evidence as a confession, was made use of by him as a reply to the statement of the detective that Bram's co-suspect had charged him with the crime, and, although the answer was in the form of a denial, it was doubtless offered as a confession because of an implication of guilt which it was conceived the words of the denial might be considered to mean. But the situation of the accused, and the nature of the communication made to him by the detective, necessarily overthrows any possible implication that his reply to the detective could have been the result of a purely voluntary mental action; that is to say, when all the surrounding circumstances are considered in their true relations, not only is the claim that the statement was voluntary overthrown, but the impression is irresistibly produced that it must necessarily have been the result of either hope or fear, or both, operating on the mind.

It cannot be doubted that, placed in the position in which the accused was when the statement was made to him that the other suspected person had charged him with crime, the result was to produce upon his mind the fear that if he remained silent it would be considered an admission of guilt, and therefore render certain his being committed for trial as the guilty person, and it cannot be conceived that the converse impression would not also have naturally arisen, that by denying there was hope of removing the suspicion from himself. If this must have been the state of mind of one situated as was the prisoner when the confession was made, how in reason can it be said that the answer which he

gave and which was required by the situation was wholly voluntary and in no manner influenced by the force of hope or fear?

168 U.S. at 562–63, 18 S.Ct. at 194–95. 168 U.S. at 562–63.

In addition to the "natural result arising from the situation of the accused and the communication made to him by the detective," the Court noted that "the conversation contained an express intimation rendering the confession involuntary within the rule laid down by the authorities," that is, the intimation of possible benefit resulting from cooperation:

[C]onceding that, closely analyzed, the hope of benefit which the conversation suggested was that of the removal from the conscience of the prisoner of the merely moral weight resulting from concealment, and therefore would not be an inducement, *we are to consider the import of the conversation, not from a mere abstract point of view, but by the light of the impression that it was calculated to produce on the mind of the accused, situated as he was at the time the conversation took place.* Thus viewed, the weight to be removed by speaking *naturally imported a suggestion of some benefit as to the crime and its punishment as arising from making a statement.*

This is greatly fortified by a consideration of the words which preceded this language—that is, that Brown had declared he had witnessed the homicide, and that the detective had said he believed the prisoner was guilty and had an accomplice. It, in substance, therefore, called upon the prisoner to disclose his accomplice, and might well have been understood as holding out an encouragement that by so doing he might at least obtain a mitigation of the punishment for the crime which otherwise would assuredly follow. As said in the passage from Russell on Crimes already quoted, "the law cannot measure the force of the influence used or decided upon its effect upon the mind of the prisoner, and, therefore, excludes the declaration if any

degree of influence has been exerted." In the case before us we find that an influence was exerted, and as any doubt as to whether the confession was voluntary must be determined in favor of the accused, we cannot escape the conclusion that error was committed by the trial court in admitting the confession under the circumstances disclosed by the record.

*Id.* at 564–65, 18 S.Ct. at 195. Thus, the Court held that the confession was not voluntary and should not have been admitted at trial.

*Bram* warrants extended discussion. It never has been modified or reversed and continues to be cited as controlling precedent on the voluntariness of confessions. In *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Court noted that the standard for admitting a confession is the same under either the fifth or the fourteenth amendment:

*Brown v. Mississippi*, 297 U.S. 278 [56 S.Ct. 461, 80 L.Ed. 682 (1936)], was the first case in which the Court held that the Due Process Clause prohibited the States from using the accused's coerced confessions against him. The Court in *Brown* felt impelled, in light of *Twining*, to say that its conclusion did not involve the privilege against self-incrimination. "Compulsion by torture to extort a confession is a different matter." 297 U.S., at 285, [56 S.Ct. at 464.] But this distinction was soon abandoned, and today the admissibility of a confession in a state criminal prosecution is tested by the same standard applied in federal prosecutions since 1897, when, in *Bram v. United States*, 168 U.S. 187, [18 S.Ct. at 542,] the Court held that "[i]n criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment to the Constitution of the United States, commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'" *Id.*, at 542 [18 S.Ct. at 186.] Under this test, the constitutional inquiry is not whether the conduct of state offi-

cers in obtaining the confession was shocking, but whether the confession was "free and voluntary: that is, [it] must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence...." *Id.*, at 542–543 [18 S.Ct. at 186–87].

378 U.S. at 6–7, 84 S.Ct. at 1492–93 [citations omitted].

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Court cited and quoted *Bram* at length in the course of holding that the privilege against self-incrimination protects an individual during custodial interrogation as well as during criminal court proceedings. The Court stated that

This question, in fact, could have been taken as settled in federal courts almost 70 years ago, when, in *Bram v. United States*, 168 U.S. 532, 542, 18 S.Ct. 183, 186, 42 L.Ed. 568 (1897), this Court held:

"In criminal trials, in the courts of the United States, wherever a question arises whether a confession is incompetent because not voluntary, the issue is controlled by that portion of the Fifth Amendment ... commanding that no person 'shall be compelled in any criminal case to be a witness against himself.'"

In *Bram*, the Court reviewed the British and American history and case law and set down the Fifth amendment standard for compulsion which we implement today....

384 U.S. at 461, 86 S.Ct. at 1621. The Court quoted *Bram* at length, *see id.* at 461–62, 86 S.Ct. at 1621 (quoting *Bram*, 168 U.S. at 549, 18 S.Ct. at 189), and said: "[t]he Court has adhered to [the] reasoning [set forth in *Bram*]," 384 U.S. at 462, 86 S.Ct. at 1621 (quoting *Wan v. United States*, 266 U.S. 1, 45 S.Ct. 1, 69 L.Ed. 131 (1924)).

In *Brady v. United States*, 397 U.S. 742, 90 S.Ct. 1463, 25 L.Ed.2d 747 (1970), where the Court found that a guilty plea entered to avoid a possible death penalty was vol-untary, *Bram* was distinguished as follows:

*Bram* is not inconsistent with our holding that Brady's plea was not compelled even though the law promised him a lesser maximum penalty if he did not go to trial. *Bram dealt with a confession given by a defendant in custody; alone and unrepresented by counsel. In such circumstances, even a mild promise of leniency was deemed sufficient to bar the confession, not because the promise was an illegal act as such, but because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess.* But *Bram* and its progeny did not hold that the possibly coercive impact of a promise of leniency could not be dissipated by the presence and advice of counsel, any more than *Miranda v. Arizona*, 384 U.S. 436 [86 S.Ct. 1602, 16 L.Ed.2d 694] (1966), held that the possibly coercive atmosphere of the police station could not be counteracted by the presence of counsel or other safeguards.

Brady's situation bears no resemblance to Bram's. Brady first pleaded not guilty; prior to changing his plea to guilty he was subjected to no threats or promises in face-to-face encounters with the authorities. He had competent counsel and full opportunity to assess the advantages and disadvantages of a trial as compared with those attending a plea of guilty; *there was no hazard of an impulsive and improvident response to a seeming but unreal advantage.* His plea of guilty was entered in open court and before a judge obviously sensitive to the requirements of the law with respect to guilty pleas. Brady's plea, unlike Bram's confession, was voluntary.

397 U.S. at 754–55, 90 S.Ct. at 1472 (foot-notes omitted, emphasis added).

In *Hutto v. Ross*, 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976) (*per curiam*), a petitioner for habeas corpus relief asserted that his confession was involuntary because it had been made in connection with a plea bargain. After petitioner had entered into a plea agreement, the prosecutor

asked petitioner if he would be willing to make a statement. Notwithstanding his counsel's advice that he did not have to make any statement and that the plea agreement did not require him to give a statement, the petitioner, with his counsel present, received *Miranda* warnings and gave a statement under oath. Petitioner later withdrew from the plea agreement and challenged the use of his statement at trial. The Supreme Court upheld the trial court finding that the confession was voluntary.

The only question in this case is whether a confession is *per se* inadmissible in a criminal trial because it was made subsequent to an agreed upon plea bargain that did not call for such a confession. We conclude that the Court of Appeals erred when it held that *any* statement made as a result of a plea bargain is inadmissible.

The Court of Appeals reasoned that respondent's confession was involuntary because it was made "as a result of the plea bargain" and would not have been made "but for the plea bargain." *Id.,* at 927, 926. *But causation in that sense has never been the test of voluntariness.* See *Brady v. United States,* 397 U.S. 742, 749–750 [90 S.Ct. 1463, 1469–70, 25 L.Ed.2d 747] (1970). *The test is whether the confession was "'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'"* *Bram v. United States,* 168 U.S. 532, 542–543 [18 S.Ct. 183, 186–87, 42 L.Ed. 568] (1897); see *Brady v. United States, supra,* [397 U.S.] at 753 [90 S.Ct. at 1471]. The existence of the bargain may well have entered into respondent's decision to give a statement, but counsel made it clear to respondent that he could enforce the terms of the plea bargain whether or not he confessed. The confession thus does not appear to have been the result of "'any direct or implied promises'" or any coercion on the part of the prosecution, and was not involuntary. *Bram v. United States, supra,* [168 U.S.] at 542–543, [18 S.Ct. at 186–87.]

429 U.S. at 30, 97 S.Ct. at 1471 (footnote omitted, emphasis added).

The Court's unwavering verbal affirmation of *Bram* has led some authorities to argue that there is virtually a *per se* rule that promises or suggestions of leniency made to a defendant in the absence of counsel render any subsequent confession involuntary. *See Miller v. Fenton,* 796 F.2d 598, 626–27 (3d Cir.1986) (Gibbons, J., dissenting) ["when promises, however slight, are made in the interrogation room rather than in the presence of counsel, those promises render the resulting confession inadmissible"]; 2 W. Ringel, Searches & Seizures, Arrests and Confessions § 25.-2(c) (2d ed. 1986) ["with regard to promises of leniency for cooperation, which in themselves are implied threats of the consequences of noncooperation, the Supreme Court has come close to establishing a per se rule of involuntariness."]

As shall be seen, however, *Bram* has not been so uniformly applied. Rather, in determining the voluntariness of confessions both the Supreme Court and the courts of appeals have looked to the totality of the circumstances, *including* any promises or threats by police officers or prosecutors.

In *Stein v. New York,* 346 U.S. 156, 184–86, 73 S.Ct. 1077, 1092–94, 97 L.Ed. 1522 (1953), *rev'd on other grounds, Jackson v. Denno,* 378 U.S. 368, 380–91, 84 S.Ct. 1774, 1782–89, 12 L.Ed.2d 908 (1964), the Court held a confession voluntary, notwithstanding that it had been induced in part by promises to release defendant's father from jail and by promises that the brother of the accused would not be prosecuted for parole violations. *See* 346 U.S. at 185–86, 73 S.Ct. at 1093–94 ["These men were not young, soft, ignorant or timid. They were not inexperienced in the way of crime or its detection, nor were they dumb as to their rights.... The spectacle of Cooper naming his own terms for confession, getting what he wanted as consideration for what he knew, reduces to absurdity his present claim that he was coerced into confession"]. *But see Jackson,* 378 U.S. at 382–84 & n. 11, 84 S.Ct. at 1784 n. 11 [critiquing voluntariness analysis of

*Stein* ]. Although the *Stein* opinion neither cites nor distinguishes the discussion of promises in *Bram*,[9] Justice Black noted in dissent that *Stein* "narrow[s] the scope this Court has previously given the Fifth Amendment's guarantee that no person 'shall be compelled in any criminal case to be a witness against himself.' ... The Court adds the *Bram* case to those it repudiates today, apparently agreeing with Professor Wigmore that Mr. Justice White's opinion there represents 'the height of absurdity....' " 346 U.S. at 198, 73 S.Ct. at 1099 (Black, J., dissenting). *But see* note 9 *supra.*

In *Shotwell Mfg. Co. v. United States,* 371 U.S. 341, 83 S.Ct. 448, 9 L.Ed.2d 357 (1963), a candy manufacturer was convicted of attempted income tax evasion for failing to report income from black-market sales in 1945–46. At trial, the Government had introduced written statements made by the defendant pursuant to the "voluntary disclosure policy," which was "a representation by the Treasury that delinquent taxpayers could escape possible criminal prosecution by disclosing their derelictions to the taxing authorities before any investigation of them had commenced." 371 U.S. at 344, 83 S.Ct. at 451. The court cited *Bram* as providing the controlling test:

It is of course a constitutional principle of long standing that the prosecution "must establish guilt by evidence independently and freely secured and may not by coercion prove its charge against an accused out of his own mouth." *Rogers v. Richmond,* 365 U.S. 534, 541 [81 S.Ct. 735, 739, 5 L.Ed.2d 760 (1961)]. We have no hesitation in saying that this principle also reaches evidence of guilt induced from a person under a governmental promise of immunity, and where that is the case such evidence must be excluded under the Self–Incrimination Clause of the Fifth Amendment. See *Bram v. United States,* 168 U.S. 532, 542–543 [18 S.Ct. at 186–87]; *Hardy v.*

9. Under New York law at the time of the *Stein* decision, the decision as to the voluntariness of a confession rested with the jury. In a state trial, the judge could exclude a confession only "if he [was] convinced that it was *not* freely made or that a verdict that it was so made would be against the weight of the evidence." 346 U.S. at 172, 73 S.Ct. at 1086. In the course of upholding the New York procedure, the *Stein* court considered whether a jury constitutionally could base a conviction on other evidence if the jury determined that a confession was involuntary. Petitioners had relied on *Bram* for the proposition that an inadmissible confession automatically required reversal. The only discussion of *Bram* by the majority came in a footnote, in the course of rejecting this argument. The Court distinguished *Bram* on its facts, and stated:

> *Bram* merely decided that a confession otherwise erroneous could not be used merely because the defendant claimed that it did not incriminate him. This is precisely what this Court subsequently held in *White v. Texas,* 310 U.S. 530 [60 S.Ct. 1032, 84 L.Ed. 1342 (1940)].

> In any event, the *Bram* case was a federal case where we exercised supervisory power rather than merely enforced the Fourteenth Amendment. It is not a rock upon which to build constitutional doctrine. According to Wigmore (3d ed., Vol. 3, pp. 240–241, n. 2), this decision represents "the height of absurdity in misapplication of the law," and has been discredited by subsequent cases.

346 U.S. at 190–91 n. 35, 73 S.Ct. at 1095 n. 35.

Footnote 35 has since been challenged in several respects. In *Jackson v. Denno,* 378 U.S. 368, 376–77, 84 S.Ct. 1774, 1780–81, 12 L.Ed.2d 908 (1964), the court overruled *Stein* and held that "the New York procedure ... did not afford a reliable determination of the voluntariness of the confession ..., did not adequately protect Jackson's right to be free of a conviction based upon a coerced confession and therefore cannot withstand constitutional attack under the Due Process Clause of the Fourteenth Amendment." *Id.* at 377, 84 S.Ct. at 1781. During the same term in which *Jackson* overruled *Stein,* in *Malloy v. Hogan,* 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964), the Court cited *Bram* as prescribing the standard for the admissibility of confessions under the fifth amendment, *see* 378 U.S. at 7, 84 S.Ct. at 1493, and held that the *Bram* standard was applicable to the states by virtue of the fourteenth amendment. *See id.* at 6, 84 S.Ct. at 1492. Moreover, as noted in the text, rather than discrediting *Bram,* Supreme Court decisions subsequent to *Stein* have cited *Bram* without reservation. *See, e.g., Hutto,* 429 U.S. at 28, 97 S.Ct. at 202; *Brady,* 397 U.S. at 754, 90 S.Ct. at 1472; *Malloy,* 378 U.S. at 6–7, 84 S.Ct. at 1492–93; *Shotwell,* 371 U.S. at 347, 83 S.Ct. at 453. Indeed, the latest edition of *Wigmore* has deleted the language above quoted from the third edition and has recognized the renewed prominence accorded *Bram* by its extensive discussion in *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See 3 Wigmore on Evidence* § 820a at 301 n. 12 (Chadbourn rev. 1970); *see generally id.* § 823.

*United States,* 186 U.S. 224, 229 [22 S.Ct. 889, 891, 46 L.Ed. 1137]; *Wan v. United States,* 266 U.S. 1, 14 [45 S.Ct. 1, 3]; *Smith v. United States,* 348 U.S. 147, 150 [75 S.Ct. 194, 196, 99 L.Ed. 192]. The controlling test is that approved in *Bram:* " 'a confession, in order to be admissible, must be free and voluntary: that is, ... not ... obtained by any direct or implied promises, however slight....' " *Bram v. United States, supra* at 542–543 [18 S.Ct. at 186–87]. 371 U.S. at 347, 83 S.Ct. at 453. *Bram* did not, however, preclude the use of the defendant's statements in *Shotwell:*

> The inapplicability here of the constitutional principles relied on by petitioners inheres in both the essential character of this offer of immunity and the particular response of these petitioners to that offer.
>
> ....
>
> The Treasury's "voluntary disclosure policy," addressed to the public generally and not to particular individuals, was not an invitation aimed at extracting confessions of guilt from particular known or suspected delinquent taxpayers. *Petitioners' position is not like that of a person, accused or suspected of crime, to whom a policeman, a prosecutor, or an investigating agency has made a promise of immunity or leniency in return for a statement. In those circumstances an inculpatory statement would be the product of inducement, and thus not an act of free will.* No such inference, however, is allowable in the context of what happened here. Petitioners' response, it is true, might not have been made in the absence of the Treasury's offer, but that in itself is not the test. The voluntary disclosure policy left them wholly free to disclose or not as they pleased. In choosing to act as they did, petitioners, far from being the victims of that policy, were volunteers for its benefits.

*Id.* at 349–51, 83 S.Ct. at 454–455 (footnotes deleted).

The Court also found that because Shotwell had supplied fraudulent information in response to the voluntary disclosure policy, petitioners "must be deemed to have recognized that such offer had in effect been withdrawn as to them or, amounting to the same thing, that they were no longer entitled to place reliance on it." *Id.* at 350, 83 S.Ct. at 454.

In a strongly-worded dissent, Justice Black argued that, "[a]lthough the Court purports to accept the *Bram* holding that the Fifth Amendment of itself forbids the use of defendant's confession 'obtained by any direct or implied promises, however slight,' its opinion most decidedly rejects this interpretation of the Amendment," 371 U.S. at 375, 83 S.Ct. at 467 (Black, J., dissenting).

Like the Supreme Court, usually the courts of appeals which have considered pre-confession promises to defendants either distinguish, or do not cite, *Bram.* In *United States v. Ferrara,* 377 F.2d 16 (2d Cir.1967), a federal agent told defendant that "if he cooperated with the United States [Attorney] I felt sure he would get out on reduced bail." *Id.* at 17. The Second Circuit rejected defendant's argument that, under *Bram,* this statement rendered defendant's confession involuntary:

> The *Bram* opinion cites with approval the statement in an English textbook that a confession is not voluntary if "obtained by any direct or implied promises, however slight". *That language has never been applied with the wooden literalness urged upon us by appellant.* The Supreme Court has consistently made clear that the test of voluntariness is whether an examination of all the circumstances discloses that the conduct of "law enforcement officials was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined * * *." *Rogers v. Richmond,* 365 U.S. 534, 544, 81 S.Ct. 735 [, 741] 5 L.Ed.2d 760 (1961); see *Haynes v. State of Washington,* 373 U.S. 503, 513, 83 S.Ct. 1336 [1343] 10 L.Ed.2d 513 (1963), quoting *Lynumn v. State of Illinois,* 372 U.S. 528, 534, 83 S.Ct. 917 [920] 9 L.Ed.2d 922 (1963).

377 F.2d at 17. *Rogers v. Richmond*, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760 (1961), did not, however, involve a claim that an accused had confessed as a result of promises of leniency or other benefit. In *Rogers*, the accused alleged that his confession was the result of a threat that his wife would be brought in for questioning if he did not cooperate. Similarly, in *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963), the Court held defendant's confession involuntary because the police had threatened to hold defendant incommunicado for an extended period of time if he did not confess. *Id.* at 514, 83 S.Ct. at 1343.

In *United States v. Robinson*, 698 F.2d 448 (D.C.Cir.1982), defendant contended that promises of an FBI agent to inform the prosecutor of defendant's cooperation, and to delay defendant's arrest for one day, rendered his statement involuntary. The court rejected defendant's argument:

> Under *Schneckloth v. Bustamonte*, 412 U.S. 218, 225, 93 S.Ct. 2041, 2046, 36 L.Ed.2d 854 (1973), the court must look to see if the confession is "the product of an essentially free and unconstrained choice by its maker." The confession may not be "extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence." *Hutto v. Ross*, 429 U.S. 28, 30, 97 S.Ct. 202, 203, 50 L.Ed.2d 194 (1976) (brackets in original), *quoting Bram v. United States*, 168 U.S. 532, 542–543, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897). This determination must be reached in light of the "totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte, supra*, 412 U.S. at 226, 93 S.Ct. at 2047.
>
> Robinson's statement is clearly voluntary under this test. Looking at the factors established by this circuit in *Pettyjohn v. United States*, 419 F.2d 651 (D.C.Cir.), *cert. denied*, 397 U.S. 1058, 90 S.Ct. 1383, 25 L.Ed.2d 676 (1970), appellant was 30 years old, possessed an eleventh-grade education, and had been convicted twice before of serious felonies. He had the maturity, education, and experience with the police to understand the waiver of his *Miranda* rights. Appellant can point to no threats or any use of force that might render his statement involuntary. Instead, he claims only that two "promises" were made to him. The first promise was that his cooperation "would be made known" to the prosecutor. This promise alone is not sufficient to "overbear his free will" under *Schneckloth* .... In fact, even when a confession is made subsequent to a plea bargain, the confession will not be deemed involuntary on that account. *Hutto v. Ross, supra*.
>
> Appellant also asserts that he was led to believe that he would not be arrested and charged that very day. FBI Agent Kerr has admitted that such was his intent, but that a superior officer overruled his decision and instructed Kerr to place appellant under arrest. Appellant argues that this "promise" was important to him because it provided him with a "period of time to straighten out his personal affairs." (Transcript of Nov. 13th Hearing at 84.) However, it would be extraordinary to say that this promise was sufficiently critical to "overbear his will." At most, Kerr promised a *delay* of the arrest. The trial judge had no problem in determining that the confession was voluntary despite these two promises .... [W]e affirm the District Court on this issue.

698 F.2d at 455 (citations omitted). Although *Schneckloth v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), does not discuss it directly, the Court did address the voluntariness of confessions in the course of its determination of an appropriate standard for evaluating the voluntariness of a consent to search.

In *United States v. Shears*, 762 F.2d 397 (4th Cir.1985), the district court had suppressed defendant's statements after finding that the defendant had been promised that (1) he could keep his truck, which had been impounded; (2) he would be released on bail; and (3) he would be able to plead to

a lesser charge. The Fourth Circuit reversed, primarily on the ground that the trial court's findings of fact were not supported in the record. In setting forth the legal framework, the court of appeals stated:

The district court correctly cited *Hutto* for the proposition that a confession is involuntary if it is "extracted by any sort of threats or violence, or obtained by any direct or implied promises, however slight, or by the extension of any improper influence." *Id.* [429 U.S.] at 30, 97 S.Ct. at 203. *Despite this broad language, the cases indicate that government agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary. Government agents may initiate conversations on cooperation, they may promise to make a defendant's cooperation known to the prosecutor, and they may even be able to make and breach certain promises without rendering a resulting confession involuntary* [citing *Ferrara, supra,* and *Robinson, supra* ]. Nevertheless, there are certain promises whose attraction renders a resulting confession involuntary if the promises are not kept, and the defendant's perception of what government agents have promised is an important factor in determining voluntariness.

762 F.2d at 401.02 (footnotes citing cases omitted, emphasis added). The Fourth Circuit did not discuss *Bram* or the other Supreme Court cases citing *Bram,* except to quote from *Hutto v. Ross,* 429 U.S. 28, 97 S.Ct. 202, 50 L.Ed.2d 194 (1976).

A promise sometimes made during interrogation is that any cooperation will be brought to the attention of the prosecuting attorney. The courts of appeals uniformly have held that such a promise, standing alone, does not render a subsequent statement involuntary. *See, e.g., United States v. Baldacchino,* 762 F.2d 170, 179 (1st Cir. 1985); *United States v. Fera,* 616 F.2d 590, 594 (1st Cir.), *cert. denied,* 446 U.S. 969, 100 S.Ct. 2951, 64 L.Ed.2d 830 (1980); *United States v. Curtis,* 562 F.2d 1153, 1154 (9th Cir.1979), *cert. denied,* 439 U.S.

910, 99 S.Ct. 279, 58 L.Ed.2d 256 (1980). None of these decisions cites or discusses *Bram.*

Less frequently, courts have relied on *Bram* in support of findings that a statement is involuntary because of pre-confession promises. In *Grades v. Boles,* 398 F.2d 409, 412 (4th Cir.1968), the court held the defendant's statement involuntary as having been induced by what defendant perceived to be a promise of immunity from prosecution:

In the instant case, no matter how much the legally-trained prosecutor may have hedged his responses with words like "policy" or "in all probability," there is no gainsaying the fact that petitioner believed, as he testified at his trial and again at his habeas corpus hearing, "I was assured by the Prosecutor that all other charges would be dropped." Petitioner did not seek out the prosecutor for an abstract discussion on criminal procedures in Cabell County. He wanted to know how *he* would be affected by "cooperating" with the police or by failing to do so. Grades asked whether he would be tried as a recidivist if he were convicted on the attempted robbery charge, not whether it was the prosecutor's general policy to press for the mandatory life sentence against persons who are convicted repeatedly of felonies. To the petitioner's ears, the prosecutor's words could have meant only one thing: If he signed the statement, he would be punished for attempted robbery and nothing else.

Nor is there room for doubt that it was this understanding of immunity from prosecution for several other offenses, including the dreaded recidivist charge, that *at least in part prompted Grades to sign the confession.* Seventy years ago the Supreme Court recognized the *inherent difficulty of calibrating the effect of an unconstitutional inducement, when it observed, " * * * the law cannot measure the force of the influence used, or decide upon its effect upon the mind of the prisoner, and therefore excludes the declaration if*

*any degree of influence has been exerted." Bram v. United States, supra* [168 U.S.] *at 543,* 18 S.Ct. *at* 187.

398 F.2d at 412.

In *United States v. Powe,* 591 F.2d 833 (D.C.Cir.1978), the court reversed defendant's conviction and remanded for a hearing on the voluntariness of defendant's statements where defendant's trial testimony, corroborated by Government witnesses, suggested that defendant's statements were the result of a detective's inquiry as to whether defendant wanted to "cooperate and assist herself in this case and help herself out," 591 F.2d at 845. *See also id.* at 845 n. 36.

◼ Although reconciliation of the case law addressing the effect of a promise on a subsequent confession is not always easy, several principles of law for testing the voluntariness of confessions clearly emerge. First, it is the Government's burden to prove, by a preponderance of the evidence, that the statement was made voluntarily. *See Lego v. Twomey,* 404 U.S. 477, 489, 92 S.Ct. 619, 626, 30 L.Ed.2d 618 (1972). Second, the court must evaluate the voluntariness of the statement in the "totality of the circumstances." *See Bryant v. Vose,* 785 F.2d 364, 367–68 (1st Cir.1986) (citing *Procunier v. Atchley,* 400 U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971)); *accord, Culombe v. Connecticut,* 367 U.S. 568, 601–02, 81 S.Ct. 1860, 1878–79, 6 L.Ed.2d 1037 (1961). Third, in determining whether the statement was voluntary, the reliability or truth or falsity of the statement is not a factor to be considered. *See Jackson v. Denno,* 378 U.S. 368, 385, 84 S.Ct. 1774, 1785, 12 L.Ed.2d 908 (1964); *Rogers v. Richmond,* 365 U.S. 534, 541, 81 S.Ct. 735, 740, 5 L.Ed.2d 760 (1961). Fourth, at least where the court is considering something *other* than a promise of leniency or other benefit, voluntariness turns upon "whether the will of the defendant [has] been overborne so that the statement was not his free and voluntary act ...," *Bryant,* 785 F.2d at 367–68 (quoting *Procunier v. Atchley,* 400

U.S. 446, 453, 91 S.Ct. 485, 489, 27 L.Ed.2d 524 (1971)).

Modern cases look to the totality of the surrounding circumstances to determine the "voluntariness" of a statement. Notwithstanding the implication in *Bram* that *any* promise taints a statement subsequently made, the more recent decisions consider a variety of factors, including the nature of the promise, *see, e.g., Robinson,* 698 F.2d at 455, the context in which the promise was made, *see, e.g, Shotwell,* 371 U.S. at 347, 83 S.Ct. at 453, the characteristics of the individual defendant, *see Stein,* 346 U.S. at 185–86, 73 S.Ct. at 1093–94, whether the defendant was informed of his rights, *see, e.g., Miller,* 796 F.2d at 609, and whether counsel was present, *see, e.g., Brady,* 397 U.S. at 754, 90 S.Ct. at 1472.

◼ The present case involves a young male defendant of average intelligence, who did not complete high school and who had never before been arrested, detained or questioned by the police. The initial questioning was conducted by Sergeant Hall after dark in a parked police car, with another marked police car positioned near the passenger-side of Hall's car and a uniformed policeman standing directly outside the door on defendant's (passenger) side of Hall's car. Hall is much larger physically, as well as more experienced in such matters, than the defendant.

Whatever other effect it may have had upon the defendant, the reading of *Miranda* rights in these circumstances, coupled with the statement by Hall that "I am the only person standing between you and going to jail for a long time," [10] must have removed any doubt the defendant may have had as to whether he was under arrest. Regardless whether, as a matter of law, defendant was in "custody," *see* note 8 *supra,* the court is entirely satisfied that the *defendant* reasonably believed that he was in custody. Thus, a young, unsophisticated defendant made incriminating statements, without the advice or presence of counsel, in circumstances reasonably conducive to the belief that he was in custody,

**10.** *See* note 3 *supra.*

and facing a long jail term unless he "talked" to Hall.

In these circumstances the mere importuning of the defendant by a police officer might have invited the "hazard of an impulsive and improvident response to a seeming but unreal advantage," *Brady*, 397 U.S. at 754, 90 S.Ct. at 1472. But Hall's representations were improper for more fundamental reasons. Hall first informed defendant that Hall was the one with whom defendant had spoken on the phone when he called for "Butch," *see* Tr. at 40, then Hall advises defendant that he had enough evidence to charge defendant with trafficking in drugs, that cooperation would be in his best interest, and then told the defendant that only Hall stood between defendant and a long jail term, *see* notes 1, 2, 3, & 7, *supra*, & APPENDIX, *infra*, and, finally, Hall read defendant his *Miranda* rights, *id.* The court fully credits defendant's testimony that he reasonably understood Hall to be saying that if defendant cooperated with Hall, Hall could keep defendant from going to jail. Defendant's testimony conforms both with Hall's testimony and with Hall's statements to defendant near the end of the police station interrogation. Hall testified that he *meant* merely that he would inform the prosecutor of defendant's cooperation, but he admitted on cross-examination that he never did explain that to the defendant.

Considering the manner in which the promise was communicated by Hall and understood by the defendant, *see Bram*, 168 U.S. at 164, 18 S.Ct. at 564; *Grades*, 398 F.2d at 412, not only did Hall induce defendant's statements by promises of a nature condoned by no authority cited by the parties or discovered by the court, but Hall actively *deceived* the defendant by promising to do something he knew he lacked the power to do. Hall was well aware that he did not have the authority to determine whether defendant would be prosecuted or imprisoned. Yet there is nothing in the record to support an inference that the defendant had any reason to question Hall's representations.

The transcript of the police station interrogation demonstrates that Hall exploited defendant's ignorance to the fullest. Having been given to understand that Hall would protect him from going to jail if he cooperated by relating the details of the aborted cocaine transaction with "Butch," defendant did so by unburdening himself and confessing to all of the details of that transaction. Whereupon, Hall launched a much broader inquiry for information concerning *other* drug transactions, dealers, purchases, and sales. When defendant said that he could not produce names of other drug dealers, Hall pointedly reminded defendant: "I'm in a position to help you. Nobody else is. I'm the one thing between you and going to jail for quite a while." PST, at 13. At the close of the interview, Hall reiterated this theme while explicitly observing that the defendant was obviously scared, concerned for his family and fearful of the exposure of his cooperation with the police. Then, after having obtained a full confession from the defendant about the aborted October 11 drug transaction, Hall went on to state that whether defendant would be charged with that crime depended upon whether defendant supplies the names of five known drug dealers. PST, at 25–26. Thus, Hall's initial promise or intimation became a snare, as well as a delusion.

In the totality of these circumstances, defendant could not intelligently and knowingly waive his right to remain silent, since Hall had misled him both as to the extent and the consequences of his cooperation. In those cases in which a defendant is told that his cooperation will be brought to the attention of the prosecuting attorney, *see, e.g., Baldacchino*, 762 F.2d at 169, at least the defendant possesses *accurate* information, as far as it goes, to enable him to inquire further and assess whether it is in fact in his interest to cooperate. In contrast, Hall's statements caused defendant to believe not only that Hall possessed the power to protect defendant from jail, but that he would do so if defendant confessed his guilt of the attempted October 11 drug transaction with "Butch"; neither representation was true or accurate.

## MIRANDA

The Government argues that the reading of *Miranda* warnings to defendant sufficiently informed him that what he said might be used against him, which is true, of course, as far as it goes. But this argument overlooks the context in which these *Miranda* warnings were read, as well as the distinction between informing a suspect of his right to remain silent and the use of intimidation and promises to induce him to break that silence.

The context: Hall first told defendant that Hall was the person with whom defendant had spoken when he telephoned "Butch," that Hall had sufficient evidence to charge defendant with trafficking in drugs and that it would be in defendant's best interest to cooperate; next he told defendant that he could keep defendant from going to jail if defendant cooperated. Either immediately before, during or immediately after Hall said these things to defendant, Hall read defendant his *Miranda* rights. Defendant testified that he understood the reading of his *Miranda* rights to mean that he was under arrest, and that he talked to Hall because he believed that Hall could keep him out of jail if he cooperated.

The nature of the intimidation used and the intimations made by Hall,[11] considered together with defendant's lack of experience with the criminal justice system, utterly vitiated any prophylactic effect of the *Miranda* warnings upon the voluntariness of defendant's subsequent statements.[12]

The implied promise of nonimprisonment or nonprosecution in exchange for cooperation, as reasonably inferred from Hall's explicit representations that it would be in defendant's best interest to cooperate and that Hall was the only one who could keep defendant from going to jail for a long time, made by a police officer without the authority (or, apparently, the intention) to make good on such a promise, effectively prevented defendant from obtaining a correct understanding of his *Miranda* rights and the implications of a decision to cooperate. *Cf. United States v. Costello*, 750 F.2d 553, 555–56 (7th Cir.1984) [statements not involuntary, where FBI agents explained that they could not offer immunity and expressly advised defendant that he could be prosecuted notwithstanding his cooperation].

The totality of these circumstances [13] cause the court to find that the Govern-

11. It would be frivolous to suggest that Hall made these statements *after* defendant had already "talked."

12. That is, defendant understood that he had a right to remain silent, but that if he exercised that right he would go to jail. If he cooperated, however, he would not go to jail, and he would not have to worry about his words being used against him. Defendant's version of how he understood his position is consistent with the colloquy at the beginning of the taped interview:

Q: [by Hall] Okay and I gave you your rights per Miranda?
A: [by defendant] Yes.
Q: You know what Miranda means; you have the right to remain silent and all that?
A: Yes.
Q: You understood all those?
A: Yes.
Q: And you are willing to talk to me now for cooperation purposes? To try to help yourself out?
A: Yes.
PST at 1.

13. The court has considered the factors made applicable by 18 U.S.C. § 3501. Section 3501 states, in part:

(b) the trial judge in determining the issue of voluntariness shall take into consideration all the circumstances surrounding the giving of the confession, including (1) the time elapsing between arrest and arraignment of the defendant making the confession, if it was made after arrest and before arraignment, (2) whether such defendant knew the nature of the offense with which he was charged or of which he was suspected at the time of making the confession, (3) whether or not such defendant was advised or knew that he was not required to make any statement and that any such statement could be used against him, (4) whether or not such defendant had been advised prior to questioning of his right to the assistance of counsel; and (5) whether or not such defendant was without the assistance of counsel when questioned and when giving such confession.

The presence or absence of any of the above-mentioned factors to be taken into consideration by the judge need not be conclusive on the issue of voluntariness of the confession. 18 U.S.C. § 3501(b).

The first factor is not applicable, as defendant was not formally arrested on October 11, 1985. Defendant knew of the offense of which he was suspected and had been advised of his right to

ment has not established the voluntariness of any statement made *after* defendant denied telephoning "Butch." Rather, defendant's statements were induced and his will was overborne by Hall's intimidation, as well as his false and misleading promises.

Moreover, the promises were made in bad faith, because Hall was neither able, nor did he intend, to honor his promise. It is the inherent duty of the court to supervise the conduct of criminal proceedings brought before it. The court cannot condone the use of statements elicited by means of deception, trickery or false promises. As the United States Supreme Court has noted in an analogous context, "[j]udicial supervision of the administration of criminal justice in the federal courts implies the duty of establishing and maintaining civilized standards of procedure and evidence," *McNabb v. United States*, 318 U.S. 332, 340, 63 S.Ct. 608, 613, 87 L.Ed. 819 (1943). Civilized standards of evidence do not permit the use of statements made in response to a promise which was false when made and which was tacitly altered or rescinded after defendant had met what he reasonably understood to be the terms of the original promise. *See McNabb*, 318 U.S. at 341–42, 63 S.Ct. at 613–14 [excluding evidence of confessions elicited from defendants deprived of their right to be taken before a judicial officer immediately after arrest, pursuant to supervisory authority of the court]; *United States v. Rodman*, 519 F.2d 1058, 1060 (1st Cir.1975) [affirming dismissal of indictment pursuant to district court's supervisory authority, due to Government's breach of plea agreement].

For the foregoing reasons, defendant's motion to suppress all statements made after defendant denied speaking to Hall on the telephone on the evening of October 11, and to suppress, as the fruits of those involuntary statements, all physical evidence obtained from defendant's person

and from the vehicle in which defendant was a passenger,[14] is GRANTED.

SO ORDERED.

### APPENDIX

The first two times Hall testified on direct examination as to the sequence of events, he makes no mention of any statements concerning cooperation. *See* Tr., pp. 6–10, 15.

At the end of Hall's direct examination, the following colloquy occurred:

Q. During the time that you were interviewing him at the police station, did you have occasion to make any promises to him?

A. No, I did not make a promise to him.

Q. Tell us what your recollection is with respect to what you were trying to accomplish with this defendant at that time?

A. During the course of the interview, I was attempting to obtain all the facts possible with relation to what I believed was a crime that had been committed at that time, conspiracy to traffic in cocaine. During or at the end of the interview, it was at that point that I was attempting to gather intelligence information only.

Q. And what did you do in an attempt to do that?

A. Talked to Mr. Pinto and explained to him that I wanted him to come up with, I believe, five names of known drug dealers, where they deal, what they deal in, things of this nature.

Q. Did you make any promises to him with respect to nonprosecution in exchange for this information?

A. No, not as nonprosecution. *I told him that I would take care of this, meaning that I would talk to the prosecutor, whoever it may be, state or federal, and explain to them that he had cooperated with me. I don't have any authority to not prosecute or prosecute in this situation.*

---

remain silent and his right to counsel, but to no avail since defendant was unable to make a knowing and intelligent determination as to the exercise of those rights. Defendant was without the assistance of counsel throughout.

**14.** The Government does not contend that the physical evidence is admissible independently of defendant's statements.

Q. So, to the best of your recollection, you made no promises of nonprosecution?

A. That's correct.

Tr. at 17–18.

On cross-examination, defense counsel followed up.

Q. Sgt. Hall, beginning with approximately the last response first, when you told Mr. Pinto that you would take care of this for him, you never used the terminology that you've used here in the courtroom, did you, as far as what you meant by what you said to him?

A. No, I—I'm not sure what you're saying, but I don't believe—

Q. You didn't tell Mr. Pinto that what you meant by the words, "I'll take care of this for you, provided you do such and such"; that what you meant was you would go to the prosecutor and tell the prosecutor that he had cooperated?

A. That's correct.

Q. You did not tell him that, did you?

A. No, I did not.

Q. So what you said to him was you'd take care of it for him?

A. That's correct.

Tr. at 18.

Defense counsel pressed Hall on what he did say.

Q. Did you tell [defendant] at the scene of the Chevron station that things would go a lot easier for him if he cooperated with you?

A. I told him it would be in his best interests to cooperate, not whether or not it would go easier.

Q. Did you tell him at the Chevron station that you were the only person between him and the courts, basically; between him and being prosecuted?

A. At that particular point, *I could have. I don't recall that I did say that. But I could have.*

Tr. at 19 (emphasis added).

Although the last response is noncommittal and ambivalent, Hall's subsequent testimony assumes that such a statement was made. In recounting, for the third time,

the sequence of events, Hall answered defense counsel's questions as follows:

Q. And did you not also say to him, prior to reading the Miranda card, "You're likely to be charged with conspiracy to traffic in cocaine. It would be in your best interests to cooperate. I stand between you and the prosecution"?

A. No.

Q. None of that type of thing?

A. No, I don't believe so. *I believe that came after* Miranda.

Q. Okay. Did it come immediately after Miranda? Is this part of the same conversation?

A. I'm not sure exactly where it comes in. I know it comes after the Miranda, but I'm not sure what the sequence is between Miranda and what you're asking.

Q. Okay. We've gotten up to the point where, as you recall it, you did read Miranda rights to him?

A. That's correct.

Q. Is that correct? And after you read the Miranda rights to him, did you proceed to also tell him these other things that you have testified were part of explaining the situation to him?

A. *I could have.* I don't recall that exact period of conversation that you're asking me about, what the exact conversation was. I just don't recall that.

Tr. at 22–23 (emphasis added).

Further on in cross-examination, defense counsel questioned Hall about a statement by Hall which appears in the middle of the transcript of the police station interview:

Hall: *Like I told you before* I'm in a position to help you. Nobody else is. I'm the one thing between you and going to jail for quite a while.

PST at 13 (emphasis added). In response to the question, *"when would you have told him that before?"* Hall replies: "I believe back at the car. I'm not sure, but I thought I'd testified to that fact that I had talked to him in the car about that." Tr. at 31.

On redirect, however, Hall flatly denies that he said, *in the car*, that he (Hall) stood

between defendant and jail. The redirect, in its entirety, is as follows:

Q. Sgt. Hall, at the interview at the police station, as reflected in Government's Exhibit 2, you had a conversation with [defendant] which defense counsel has quoted to you, which reads as follows, or went as follows: "so I think right now, *like I told you in the car*, I'm the one friend that you've got. The one guy that is going to be on your side to keep you out of jail." Do you recall making that statement to the defendant at the interview at the police station?

A. Yes, I do.

Q. Now, you equated that, or said that was similar to something you had said to him in the police vehicle at the police station; is that correct?

A. In the police vehicle at Chevron station.

Q. Excuse me. At the Chevron station?

A. Yes.

Q. Now, you had indicated that what you told him in the police vehicle at the Chevron station was that cooperation was in his interest?

A. That's correct.

Q. So is there something else that is not reflected in your police report that you told him in the car with respect to his cooperation?

A. No.

Q. Did you say—did you say these words to him, which are reflected in the interview at the police station? Did you say those *identical* words to him in the police car at the gas station?

A. No, I did not.

Q. Okay. What did you tell him at the gas station, to the best of your recollection?

A. That his cooperation would be in the best interests. There was no cut and dry situation there. That knowing that I had the information that I'd need to make the case on him, that it would be in his best interests to cooperate.

Q. Did you elaborate on it in any way to tell him that you were the only person between him and jail while you were in the car?

A. No, I did not. At the police station, I did.

Q. Did you ever make any promises to him while in the police car that he wouldn't be prosecuted if he cooperated?

A. No, I did not.

Q. Prior to this statement *at the end of the interview* about keeping him out of jail, had you made any statements like that to him while at the police station, other than this one statement? [1]

A. No.

Tr. at 34–36 (emphasis added). As the transcript reflects, Hall made such statements *twice* during the course of the interview at the police station. *See* PST at 13 & 26.

In the fourth recounting of the sequence of events, in response to questions by the court, Hall characterized the relevant events as follows:

THE COURT: And then [after Hall gave his name and asked Pinto to sit in Hall's car] what happened, exactly, and in what order?

THE WITNESS: I told him that I was the person that he had talked to over the phone, and he denied it. He stated he hadn't talked with anybody over the phone; that he was just sitting in the parking lot not doing anything. At that time I gave him his rights from the Miranda card and talked to him about the fact that cooperation would be in his best interests, and concluding, going up to the point of obtaining the pot pipe off him and obtaining the tin out of the front seat of the car that he was in.

Tr. at 40.

The probative value of *defendant's* testimony on the question of what was said while defendant sat in Hall's vehicle is substantially diminished by the leading nature of defense counsel's question:

[1]. The probative value of Hall's response to this question is negligible due to the leading nature of the question.

Q. [by defense counsel] Let me stop you for a minute. Up to the point that he had asked you if you had anything on you, and you handed him pot scales, had Mr. Hall said anything to you to the effect that he was the only person standing between you and jail, this type of thing?

A. Yeah. If I would talk to him, that he could help me, and he was the only one between me and jail, so that it would be in my best interests if I cooperated; you know, if I did talk to him.

Tr. at 47.

On cross-examination by the Assistant United States Attorney in recounting the sequence of events, *defendant* simply says "He told me it would be in my best interests if I would talk to him." Tr. at 54.

In the seventh and eighth recountings of the events, there is no further testimony bearing on precisely *what* was said by Hall to defendant at the Chevron station.

As noted above, the transcript of the interview at the police station contains two relevant passages. At page 13, in the course of questioning Pinto about mushrooms found in the car, Hall states:

MH: You know I don't think it is just a cas [sic] of someone just giving you the mushrooms, I think you probably bought them somewhere.

CP: No I didn't.

MH: Well you know Junior it is not going to do any good to hide things cause I'm going to know.

CP: I know. I understand that.

MH: *Like I told you before I'm in a position to help you.* Nobody else is. I'm the one thing between you and going to jail for quite a while. there was a mushroom factory down there in Belfast that got raided a while back. Do you remember that? Winterport, Belfast area. Percy Sargent, Johnson and some other people, they were involved in the Michael Cochran murder.

Police Transcript, at 13 (emphasis added). There is no statement in the transcript of the police station interview, prior to this point, referring to Hall being "in a position" to help defendant. Thus, the statement "Like I told you before" must refer to a statement at the Chevron station, as indeed it did, as expressly acknowledged by Hall at the close of the police station interview:

MH: Alright if you don't come in Tuesday then the whole thing changes. You know I've got my end of the conversation on the phone, I've got the phone number that you gave to call back, I've got the whole nine yards. I've got the stuff out of [y]our car; so you know there is no problem the case is made if I want to use it. I am more interested in helping you out. I know the position that you are in. You are married, you've got two kids, your getting involved in the drug trade which maybe [sic] if what you tell me is true

CP: It is.

MH: you are not heavy into it, then this may be enough to rock your boat to keep you out of it. You know it's too bad to take a guy that does have a record[2]

CP: It is the first time I ever been in a police station.

MH: So I think right now, *like I told you in the car* I'm the one friend that you've got. The one guy that is going to be on your side to keep you out of jail. So all the information you give me, the more you give me the better off you are going to be. Okay this tape stays with me it doesn't go anywhere at this time. Okay we will shut the tape off.

PST, at 25–26 (emphasis added).

---

**2.** From the context of the conversation it appears that Hall intended to say "its too bad to take a guy that does *not* have a record ..."

Defendant testified that he had never been involved with the police, and the Government introduced no evidence to the contrary.