**UNITED STATES of America**

v.

**Peter BOUCHARD, Defendant.**

**Crim. No. 94–54–P–C.**

United States District Court,
D. Maine.

May 2, 1995.

does not, in itself, render that interpretation in- accurate.

Frederick Emery, Asst. U.S. Atty., Portland, ME, for Government.

Thomas Hallett, Portland, ME, for defendant.

*MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR RECONSIDERATION AND SUPPLEMENTAL MOTION FOR RECONSIDERATION*

GENE CARTER, Chief Judge.

Defendant Peter Bouchard is facing a six-count indictment which alleges that, on three different occasions, Defendant provided false information on a bank credit application and, on these same applications, used a false social security number (Docket No. 1). Now before the Court is Defendant's Motion for Reconsideration (Docket No. 23) and Supplemental Motion for Reconsideration (Docket No. 27). Both of these motions derive from Defendant's Motion to Dismiss or Suppress (Docket No. 6). Defendant seeks to avoid conviction, either through dismissal of the indictment or suppression of evidence, by asserting "outrageous government conduct" on the part of Federal Bureau of Investigation Special Agent Ronald Dox ("Dox"). The Defendant's allegations of this misconduct follow.

## I. FACTS

In November 1986, while living in Massachusetts, Defendant pleaded guilty to a state charge of larceny by check; the state court imposed a sentence of three years probation and ordered Defendant to pay restitution of $22,000. Defendant failed to make such a payment and a default warrant for his arrest was issued. Defendant moved to Maine in 1987 and met Susan Martel. In 1988, when he and Ms. Martel were engaged to be married, Bouchard disclosed to Ms. Martel the fact that he owed the outstanding restitution payment and sought a loan from Ms. Martel's stepfather, Victor Martel, to pay the amount.

At about the same time, Dox began an investigation of Defendant stemming from a complaint by Defendant's employer, an insurance company, that Defendant was embezzling money. Dox contacted Defendant to discuss these allegations. A meeting was held at the FBI offices in Portland on July 25, 1988, at which time Defendant admitted to Dox that he had submitted fraudulent invoices to his employer. Defendant alleges that, prior to this meeting, Dox had contact-

ed Susan Martel and her step-father and informed them that Defendant was under investigation. As a result, Ms. Martel broke off her engagement to Defendant and Victor Martel withdrew his offer of a loan to pay the restitution owed in Massachusetts.

After the July, 1988, meeting with Defendant, Dox allegedly established a "paternal relationship" with Ms. Martel, who eventually resumed her romantic relationship with Defendant. Dox maintained frequent contact with her and allegedly cautioned her that Defendant was "dangerous" and offered to "protect" her from Defendant. Dox allegedly persuaded her to cooperate with the investigation by stating that she could be charged with accomplice liability. Defendant also alleges that Dox attempted to convince Ms. Martel to leave Defendant and that he approached her in her capacity as a bank employee regarding his obtaining a car loan through the bank.

Dox contacted Defendant for a second meeting in September of 1989, as a result of information obtained by Dox from Ms. Martel regarding a bank account maintained by Defendant under a different name. During this meeting, Defendant admitted to embezzling approximately $23,000 from his employer (who was different from the previous employer). As a result of Dox's urging, Defendant immediately returned approximately $20,000 to his employer, using funds that he claims he had intended to use to make the restitution payments owed in Massachusetts. Defendant alleges that Dox continued to "hound" him regarding the unpaid restitution and threatened to have him arrested on the outstanding Massachusetts warrant. Defendant asserts that, in order to get Dox "off his back," Defendant then obtained the bank loans and line of credit that are the subject of the present charges.

Defendant next alleges that Dox urged Ms. Martel to convince Defendant to "come clean" regarding all of his criminal activity, and assured her that, if Defendant would admit to all wrongdoing and pay back his victims, Dox could "close the file" and Defendant would not do any jail time. Defendant claims that, during this time, he did pay back

all funds obtained fraudulently or through any illegal means. In March 1991 Defendant began to make payments on the restitution.

On March 25, 1991, Dox instigated Defendant's arrest by contacting Windham police and alerting them to Defendant's fugitive status. Dox met with Defendant while he was in the custody of the Windham police, at which time Dox allegedly asserted that Defendant would not go to jail on federal charges if he would "come clean." Defendant made additional incriminating statements.

Defendant contacted Dox shortly thereafter with a question regarding the payment of restitution and to request a meeting with Dox to make the full disclosure that Dox had been seeking. Defendant claims that during the three subsequent meetings with Dox, Dox repeatedly stated that, as long as Defendant would come clean, he would not face incarceration and that Defendant, relying on these promises, made inculpatory statements.

The last arranged meeting between Dox and Defendant occurred on April 29, 1991. That fall, however, Defendant ran into Dox, thanked him for helping Ms. Martel and him, and invited Dox to their wedding in October, 1991.[1] Three years later, an indictment was returned charging Defendant with providing false information on credit applications and use of a false social security number.

Defendant filed a Motion to Dismiss or Suppress asking this Court to dismiss the indictment or, in the alternative, suppress certain inculpatory statements provided by Defendant to federal law enforcement agents. One of the asserted bases for this relief is the alleged "outrageous government conduct" of Dox. Specifically, Defendant alleges that Special Agent Dox used Defendant's fiance (now his wife) in an attempt to manipulate Defendant into confessing to various criminal activities, including those at issue in the present indictment. Defendant further alleges that Dox used the fact that Defendant was the subject of an outstanding warrant in Massachusetts for violating probation as a way to control Defendant and to

---

1. Special Agent Dox declined the invitation.

coerce him into repaying the companies he had defrauded and "coming clean" regarding all instances of fraud against insurance companies, banks, and employers.

This Court's March 1, 1995, Order denied without a hearing most of the combined motion and set the remaining issue for an evidentiary hearing (Docket No. 19).[2] In the Order, the Court made the following rulings: 1) denying that part of the Motion seeking a dismissal of the indictment on a theory of outrageous government conduct after concluding that Defendant had failed to make a threshold showing of such conduct; 2) denying that part of the motion seeking a dismissal of the indictment on the basis of an alleged violation of the Speedy Trial Act and Sixth Amendment of the United States Constitution upon concluding that Defendant has not demonstrated any such violations; 3) denying that part of the motion seeking to suppress certain statements by Defendant on a theory of outrageous government conduct for Defendant's failure to make a threshold showing of such conduct; and 4) setting for evidentiary hearing the issue of whether this Court should suppress certain statements of Defendant on the basis that they were "improperly and illegally obtained." Defendant seeks reconsideration on the first and third rulings of that Order.

## II. DISCUSSION

### A. Outrageous Government Conduct

Defendant seeks an Order dismissing the indictment or, in the alternative, suppressing certain statements, on the basis of "outrageous government conduct." This doctrine can be viewed as a constitution-based spin-off of the entrapment defense. *Dicta* in two United States Supreme Court decisions have suggested that, even if a criminal defendant were unable to advance an entrapment defense successfully due to his "predisposition" to commit the crime, the due process clause nonetheless prevented the government from

obtaining a conviction where there had been outrageous conduct by a law enforcement officer. The "outrageous government conduct" defense was suggested by then-Justice Rehnquist writing for the majority in *United States v. Russell*, 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973). In that case, the Supreme Court reinstated a conviction which had been vacated by the court of appeals on the basis of entrapment. Rehnquist explained that the Court employs a subjective approach to determine entrapment, which examines a defendant's predisposition to commit the crime, in contrast to an "objective" approach to entrapment, in which the focus is upon the government's conduct. Therefore, the jury's decision in *Russell* that the defendant was predisposed to committing the crime was fatal to the defense of entrapment.

Notwithstanding this rejection of an objective approach, Justice Rehnquist allowed the possibility that the Court "may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction." *Id.* at 431–32, 93 S.Ct. at 1643. On the facts of *Russell*, however, the Court concluded that, "the instant case is distinctly not of that breed. . . . The law enforcement conduct here stops far short of violating that 'fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Id.* at 432, 93 S.Ct. at 1643 (quoting *Kinsella v. United States ex rel. Singleton*, 361 U.S. 234, 246, 80 S.Ct. 297, 303, 4 L.Ed.2d 268 (1960)).[3]

Three years later, in *Hampton v. United States*, 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), a defendant asserted a defense rooted in due process, rather than entrapment, based upon the Court's suggestion in *Russell*. Although a majority of justices in a badly-fractured Court rejected Hampton's appeal, five justices nonetheless recognized the defense. Justice Rehnquist,

---

**2.** That issue was set for an evidentiary hearing which was held on March 16, 1995, and remains under advisement with this Court.

**3.** In *Russell,* it was alleged by the defense that undercover narcotics agents offered Defendant

an essential ingredient, which was legally available but difficult to obtain, to the manufacture of methamphetamine. *Russell,* 411 U.S. at 425–26, 93 S.Ct. at 1639–40.

writing for three justices, sought to explain that none of his remarks in *Russell* should be construed to hold that a defendant may avoid prosecution on the basis of government misconduct other than by proving that he was entrapped. *Id.* at 490, 96 S.Ct. at 1650. Justice Powell, in a concurrence joined by Justice Blackmun, rejected an analysis based on *Russell,* or any other case, which would preclude a defense based upon due process rather than entrapment. Powell cautioned, however, that "the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." *Id.* at 495 n. 7, 96 S.Ct. at 1653 n. 7. The three dissenting justices also disagreed with Justice Rehnquist's rejection of the outrageous government conduct defense. *Id.* at 496, 96 S.Ct. at 1653.

These diverse pronouncements from the Supreme Court have led some of the federal courts to take a very constricted and reluctant view of the doctrine. Although most federal courts, including the Court of Appeals for the First Circuit, have recognized the theoretical validity of an "outrageous government conduct defense," and many defendants have and continue to assert it, few courts have ever based the reversal of a conviction or the dismissal of a charge squarely upon the doctrine of outrageous government conduct.

The Court of Appeals for the Third Circuit is one of the few courts that have reversed a conviction basing its decision entirely on outrageous government conduct, and following the suggestion extended by the Supreme Court in *Russell* and *Hampton.* *United States v. Twigg,* 588 F.2d 373 (3d Cir.1978). The *Twigg* panel reversed a conviction in a case where federal agents had established a methamphetamine manufacturing laboratory, supplying the chemicals, manufacturing materials, and location. The defendant in that case was involved in the production of drugs in the laboratory. There is considerable doubt, however, regarding whether *Twigg* remains good law in the Third Circuit. *See United States v. Beverly,* 723 F.2d 11, 12 (3d

Cir.1983); *United States v. Jannotti,* 673 F.2d 578, 610 n. 17 (3d Cir.) (en banc), *cert. denied* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982)

Two other courts of appeals have recognized the defense and used it as a basis for rulings in defendants' favor. In *United States v. Lard,* 734 F.2d 1290 (8th Cir.1984), the Court of Appeals for the Eighth Circuit reversed a conviction on the basis of entrapment but stated, as an alternative holding, that the conviction should be reversed because the government agent's "overinvolvement in conceiving and contriving the crimes here approached being 'so outrageous that due process principles should bar the government from invoking judicial processes to obtain a conviction.'" *Id.* at 1296 (quoting *Russell,* 411 U.S. at 431–32, 93 S.Ct. at 1643). In that case, the court noted the investigators' "over zealous efforts," which included smoking marijuana with the defendant, to investigate the crime. *Lard,* 734 F.2d at 1297.

The Court of Appeals for the Ninth Circuit, on a claim of outrageous government conduct, reversed a conviction and remanded the case to the District Court for findings of fact. *United States v. Bogart,* 783 F.2d 1428 (9th Cir.1986), *vacated in part on other grounds sub nom. United States v. Wingender,* 790 F.2d 802 (9th Cir.1986). The panel acknowledged that the determination of when government conduct reaches a "'demonstrable level of outrageousness' [sufficient] to constitute a due process violation is 'at best elusive.'" *Id.* at 1435 (quoting *Jannotti,* 673 F.2d at 606). The panel also stated that it would not take the restrictive view suggested by other courts to limit the doctrine's application to instances of conduct constituting actual physical or psychological coercion. *Id.* (citing *United States v. Kelly,* 707 F.2d 1460, 1476 n. 13 (D.C.Cir.), *cert. denied,* 464 U.S. 908, 104 S.Ct. 264, 78 L.Ed.2d 247 (1983)).

Since *Bogart,* however, no federal court of appeals has used the doctrine as the basis of a ruling.[4] The current trend in courts of

4. In fact, since *Hampton* was decided, only three

published district court opinions have granted

appeals is, not only to refrain from extending the doctrine to cases at hand, but to question the continuing validity of the doctrine itself. Most notable is the recent emphatic opinion of the Court of Appeals for the Sixth Circuit in *United States v. Tucker,* 28 F.3d 1420 (6th Cir.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 1426, 131 L.Ed.2d 308 (1995), which squarely rejected the doctrine and created a significant split of authority in the federal courts. In that case, the district court had granted the defendant's motion to dismiss her indictment for trafficking in food stamps on the basis of outrageous government conduct, which consisted of a government operative's repeated attempts to persuade the defendant to purchase food stamps.[5] The Court of Appeals for the Sixth Circuit reviewed the Supreme Court case law, including the remarks in *Russell* and *Hampton,*— all of which, it pointed out, were *dicta*—and concluded that the doctrine was inconsistent with the subjective approach to entrapment. It also noted that the Sixth Circuit had never been presented with a set of facts that would support the use of the "due process defense" and, indeed, that other federal courts regularly reject the extension of the doctrine to the cases they review. The panel expressed concern that courts' scrutiny of government agents' conduct during federal investigations presented a dangerous threat to the separation of powers. *Tucker,* 28 F.3d at 1426. The panel concluded, "In sum, there is no binding Supreme Court authority recognizing a defense based solely upon an objective assessment of the government's conduct in inducing the commission of crimes." *Id.* See also *United States v. Nava-Salazar,* 30 F.3d 788, 800 (7th Cir.) (questioning the continuing validity of the doctrine), *cert. denied sub nom. Casas v. United States,* —— U.S.

——, 115 S.Ct. 515, 130 L.Ed.2d 421 (1994); *United States v. Miller,* 891 F.2d 1265, 1271 (7th Cir.1989) (Easterbrook, J., concurring) (advocating the complete rejection of the doctrine).

The Court of Appeals for the First Circuit has expressly acknowledged that such a defense *could* be sustained upon presentation of the proper facts—but has never seen such a set of facts. *See, e.g., United States v. Gifford,* 17 F.3d 462 (1st Cir.1994); *United States v. Matiz,* 14 F.3d 79 (1st Cir.1994); *United States v. Santana,* 6 F.3d 1 (1st Cir. 1993) (collecting cases); *United States v. Penagaricano–Soler,* 911 F.2d 833 (1st Cir. 1990); *United States v. Panitz,* 907 F.2d 1267 (1st Cir.1990) (collecting cases); *United States v. Michaud,* 860 F.2d 495 (1st Cir. 1988); *United States v. Bradley,* 820 F.2d 3 (1st Cir.1987); *United States v. Porter,* 764 F.2d 1 (1st Cir.1985). This Court has done likewise. *United States v. Collamore,* 751 F.Supp. 1012 (D.Me.1990), *aff'd* 940 F.2d 646 (1st Cir.1991).

In *U.S. v. Santana,* the First Circuit reversed a district court's dismissal of drug charges on the basis of outrageous government conduct and provided a review of the state of the law on outrageous government conduct in this circuit. Although the panel maintained that it was possible that some set of facts could make out such a defense, it acknowledged that the "banner of outrageous misconduct is often raised but seldom saluted.... [T]he doctrine is moribund; in practice, courts have rejected it with almost monotonous regularity." *Santana,* 6 F.3d at 4. In attempting to provide a specific standard for the determination of whether a defendant has made a sufficient showing of outrageous

---

motions to dismiss on this basis. *United States v. Marshank,* 777 F.Supp. 1507, 1511, 1525 (N.D.Cal.1991) (government agents had "ongoing relationship" with the defendant's attorney and "actively collaborated with [defendant's attorney] to build a case against the defendant"); *United States v. Gardner,* 658 F.Supp. 1573, 1576 (W.D.Pa.1987) (the defendant was "badgered, implored, inveigled and purposely set up by an agent of the Government in order to allow the government to prosecute and convict him.... The government initiated and was actively involved in the criminal enterprise itself."); *United States v. Batres–Santolino,* 521 F.Supp. 744, 751–

52 (N.D.Cal.1981) ("[The] government, through its agent, went about putting persons into the business of crime for the first time.").

**5.** Apparently, the operative, a friend of the defendant for more than ten years, pleaded with defendant to purchase the food stamps, claiming that she was in "dire financial need" and was selling the food stamps in order "to provide a 'proper Christmas' for her children." *United States v. Tucker,* 28 F.3d 1420, 1421 (6th Cir. 1994).

conduct, the panel examined "clues" in various Supreme Court decisions, such as the Court's "explicit equation of outrageous conduct with violations of 'that fundamental fairness, shocking to the universal sense of justice,' mandated by the Due Process Clause of the Fifth Amendment." *Id.* (quoting *Russell,* 411 U.S. at 432, 93 S.Ct. at 1643).

The appeals court in *Santana* rejected the district court's attempt to establish a seven-part test to determine when government conduct, specifically in undercover drug operations, rises to a level of misconduct that suggests a violation of a defendant's due process rights. The panel wrote: "We appreciate the district court's effort.... Nevertheless, we do not think that the inquiry into outrageousness can be usefully broken down into a series of discrete components.... We find that outrageousness, by its nature, requires an *ad hoc* determination." *Id.* at 6. The panel also cautioned that, although the analysis must done on a case-by-case basis, "the calculus must be rooted in the record." *Id.* For example, it noted as error the district court's failure to consider the "nature and scope of the investigation," when determining whether the amount of drugs used in an undercover operation was improper. *Id.* at 7. It observed, "The outrageousness *vel non* of a police officer's actions can only be evaluated by taking into account the totality of the relevant circumstances." *Id.*

The panel also noted the "two competing visions of the doctrine's role": whether the defense should be restricted to instances where a defendant alleges actual extreme physical or psychological abuse or whether outrageous government conduct serves as a modified entrapment defense where it appears that law enforcement personnel actually " 'creat[ed]' the crime or ... 'coerced the defendant's participation in it.' " *Id.* at 5 (quoting *United States v. Mosley,* 965 F.2d 906, 911–1̃2 (10th Cir.1992)). The facts of *Santana,* however, did not require the panel to choose between the two approaches.

### B. The Motion to Dismiss

 Although the state of law of outrageous government conduct remains unclear and its fate uncertain, this Court has no difficulty concluding that Defendant's allegations do not approach the necessary showing to successfully assert such a defense. As a preliminary note, this Court denied Defendant's combined Motion to Dismiss or Suppress without holding an evidentiary hearing on this issue. A criminal defendant is not entitled to an evidentiary hearing on every pretrial motion; the determination whether such a hearing will occur is a matter of judicial discretion. *Panitz,* 907 F.2d at 1273 (holding, in a case where the defendant had unsuccessfully sought an evidentiary hearing on his motion to dismiss based on outrageous government conduct, that "[t]he test for granting an evidentiary hearing in a criminal case should be substantive: did the defendant make a sufficient threshold showing that material facts were in doubt or dispute?"). *See also United States v. Lewis,* 40 F.3d 1325, 1332 (1st Cir.1994) (holding that, in order to make a sufficient showing of a substantial claim on a motion to suppress entitling a defendant to an evidentiary hearing, a defendant must "allege facts that are sufficiently definite, specific, detailed, and nonconjectural."). Whether Defendant has successfully presented a claim of outrageous government conduct amounting to a violation of his due process rights is a question of law for the Court. *Bradley,* 820 F.2d at 7.

This Court's March 1, 1995, order concluded that Defendant's allegations had failed to reach this minimum threshold. Upon reconsideration, this Court concludes that its original ruling was correct. It is clear from the allegations submitted to this Court, along with the oral argument of Defendant's counsel, that Defendant has not made a sufficient showing of a substantial claim of outrageous government conduct that would, if proven, entitle him to dismissal of the indictment.

 This Court's review of the case law discussing the outrageous government conduct defense compels the conclusion that the defense is not applicable here. The doctrine is most often asserted as an alternative basis of dismissal when a defendant asserts entrapment or some other instance of government "overinvolvement" in the actual commission of the alleged crime, particularly in

cases where government agents have set up undercover "stings" or used operatives. *See, e.g., Gifford*, 17 F.3d at 470 (child pornography); *Matiz*, 14 F.3d at 82 (narcotics); *Santana*, 6 F.3d at 5 (narcotics); *Penagaricano–Soler*, 911 F.2d at 836 (bank currency reporting); *Panitz*, 907 F.2d at 1270 (narcotics); *Bradley*, 820 F.2d at 7 (narcotics); *Porter*, 764 F.2d at 8 (narcotics).

Here, however, Defendant does not allege that Dox had a direct hand in the creation of *the crimes for which Defendant is accused.* Instead, Defendant seeks an opportunity to present evidence that Dox repeatedly threatened to turn Defendant over to Massachusetts law enforcement authorities on the outstanding warrant for nonpayment of restitution and told Defendant that, as long as he paid the restitution, he would not be arrested. Defendant claims, therefore, that he obtained the bank loans and credit line at issue in order to get Dox "off his back." There is no suggestion, however, that Dox knew that Defendant would obtain these loans illegally or suggested that he do so.

In fact, Defendant has not shown this Court that he is able to prove that the proceeds of these loans and credit line actually went to pay the restitution owed. In accordance with a Order of this Court, Defendant submitted a proffer to this Court regarding the use of proceeds from the loans (Docket No. 43). Although it is not disputed that proceeds from the October 19, 1989, $10,-000.00 loan (Counts I and II) were used to pay a portion of the approximately $12,000 Defendant owed State Farm Insurance for a payment on a fraudulent claim, there is absolutely no indication that Dox's statements that day *led* to the filing of a *false* application later that day. In fact, the Government asserted in its oral argument to this Court that, on that same day, and after Defendant told Dox he would obtain a loan to pay State Farm, Dox allegedly warned Defendant not to provide false information in an attempt to secure the loan since such an act was in violation of federal law.

The Defendant's proffer entirely failed to demonstrate any link between the credit applications at issue here and the payment of the restitution owed in Massachusetts. Defendant acknowledged that the proceeds from the March 19, 1990, Citibank loan for $6,900 (Counts III and IV) were used to purchase a $4,500 automobile. He alleges that the balance of these proceeds was "collected to make payment for restitution," although he does not state whether the money was actually used in that manner. Moreover, the first payment of restitution was not made for nearly a year after the loan was obtained. This Court concludes that Defendant has not adequately demonstrated an ability to trace the funds from this loan to the restitution payments.

Similarly, Defendant has not shown that the funds he obtained through the "Ready Credit" account at Citibank (Counts V and VI) were used to pay the restitution owed. Defendant states in his proffer that he accessed the line of credit (Counts V and VI) on September 14, 1990, in the amount of $5,000, deposited the funds in a checking account, withdrew the money in December to pay the court in Massachusetts, redeposited the money in February 1991, withdrew money again on March 1, and finally paid the Massachusetts court by cashier's check on March 2, 1991. As with the March 1990 loan, it would be highly speculative of this Court to conclude that, after all of these transactions, the money originally accessed from the line of credit actually went to pay the outstanding restitution.

Moreover, even if the funds could be traced directly to the Citibank loan and credit account, the significant period of time that passed from the time Defendant initially obtained these funds to the actual payment to the court does not suggest that Defendant was so desperate to get a government agent "off his back" that he concluded that, regardless of the means, it was imperative for him to obtain this money. Defendant's allegations simply fail to paint a plausible picture of outrageous government conduct.

This Court also notes that the Government's Response to Defendant's Proffer (Docket No. 46) demonstrates that, through the use of bank documents, the government is well-prepared to refute Defendant's allegations regarding the use of the line of credit.

Most notably, the government's response indicates that bank records show the last advance on this account as occurring on August 23, 1990, and that $2492.14 of the total of $4990.21 accessed from the account was withdrawn in the form of checks to specific payees, such as credit card and utility companies.

Even assuming that Defendant's allegations are true and that Dox aggressively persuaded Defendant to pay the restitution and return all monies he had embezzled or otherwise obtained illegally, there is no basis on which to conclude that such conduct is sufficiently outrageous to constitute a violation of "fundamental fairness, shocking to the universal sense of justice mandated by the Due Process Clause." *Russell*, 411 U.S. at 432, 93 S.Ct. at 1643. The failure to reach the minimum threshold is particularly clear when Defendant's allegations are compared to the fact patterns presented in the long string of cases in this and other circuits holding that the alleged conduct does not entitle a defendant to dismissal of charges.[6]

It *could* be a different matter, for instance, if Dox threatened Defendant with prosecution unless Defendant paid *Dox* large sums of money.

To a great extent the allegations of "outrageous conduct" alleged in Defendant's motion involve actions by Dox that, if true, are entirely unrelated to the loan applications and false social security number. For example, Defendant alleges that Dox "met with Victor Martel, for no purpose other than to disrupt Bouchard's life, alienate Victor Martel from Bouchard, and cause Victor Martel to withdraw financial and emotional support from Bouchard," Defendant's Memorandum in Support of Motion to Dismiss or Suppress (Docket No. 7) at 7, and that Dox met with Defendant's fiance to establish a confidential relationship with her to obtain information regarding Defendant and to get her to break off their engagement. Moreover, much of the conduct complained of here actually occurred in 1991, long after Defendant had obtained the loans, precluding any connection

---

6. Defendant argues that the fact pattern of *United States v. Omni International*, 634 F.Supp. 1414 (D.Md.1986) provides this Court with persuasive authority to dismiss the charges here. That case is quite different from the case at bar since it addresses the occurrence of post-indictment prosecutorial misconduct, causing actual prejudice to the defendant. More importantly, however, Defendant reliance on this case suggests that he has confused the doctrine of "outrageous government conduct," which derives from the Due Process Clause of the Fifth Amendment, and this Court's "supervisory power," which derives from the Court's inherent authority over the proceedings before it and "necessary to the exercise of all other[ ] [powers.]" *United States v. Horn*, 29 F.3d 754, 759 (1st Cir.1994) (quoting *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 764, 100 S.Ct. 2455, 2463, 65 L.Ed.2d 488 (1980)). *Omni* addresses only the latter and is devoid of any mention of a due process basis to dismiss the charges there.

The conduct alleged here cannot be addressed by this Court's supervisory power. As the First Circuit has explained, there are "only three legitimate purposes for the exercise of a court's supervisory power: 'To implement a remedy for violation of recognized rights, to preserve judicial integrity, ... and finally, as a remedy designed to deter future illegal conduct.'" *United States v. Matiz*, 14 F.3d 79, 83 (1st Cir.1994) (quoting *United States v. Hasting*, 461 U.S. 499, 505, 103 S.Ct. 1974, 1978, 76 L.Ed.2d 96

(1983)). This case is similar to *Matiz*, in which the defendant asserted this basis as an alternative to his claim of outrageous government misconduct on the part of federal agents, and in which the Court of Appeals concluded that none of the three bases for invoking the power were applicable there. *Matiz*, 14 F.3d at 83. The first basis could not be satisfied absent a showing of outrageousness or "any specific violation of a statutory or constitutional right." *Id*. The panel noted that the second basis did not apply since the exercise of such powers may only be used by a court "to supervise its own affairs, not the affairs of other government branches," and "does not 'justify a chancellor's foot veto over activities of coequal branches of government'." *Id*. (quoting *Russell*, 411 U.S. at 435, 93 S.Ct. at 1644). Finally, in order to base the exercise of the court's inherent powers on "deterring future illegal conduct," a court must first find that there was "past illegal conduct." *Matiz*, 14 F.3d at 83. The facts, as presented on this motion, mandate the same result here.

Furthermore, the First Circuit has held that supervisory powers apply "only when there is no effective alternative provided by rule, statute, or constitutional clause." *Horn*, 29 F.3d at 760. Additionally, it is inappropriate to use the power in instances where the misconduct has not resulted in actual harm. *Id*. Accordingly, this Court declines to apply its supervisory powers to the case.

between such actions and the crimes alleged here.[7]

·The alleged "outrageous conduct" of Dox, therefore, amounts to interfering with Defendant's attempts to secure a loan from Victor Martel and to marry Susan Martel. Assuming that that conduct occurred, it cannot serve as grounds to dismiss the indictment here. To succeed on this motion, Defendant must establish that the conduct on the part of a government agent was a substantial contributing . factor to causing Defendant's criminal conduct. The aim of the outrageous government conduct doctrine, discouraging bad behavior by government agents, is not served through the dismissal of charges of a criminal offense that are unconnected to the challenged action. In effect, Defendant here seeks to avoid conviction on these charges by "cashing in" on Dox's allegedly outrageous conduct in other matters, although that conduct is not even a remotely contributing factor to Defendant's acts which are serving as the basis of the present charges.

 By requiring a defendant to demonstrate that government conduct is a substantial contributing factor to the criminal charges he faces, this Court attempts to resolve an issue that the First Circuit left open in *Santana.* Namely, whether the doctrine should be applied to cases of "extreme physical, and possibly psychological, abuse of a defendant," and/or to instances "where law enforcement personnel become so overinvolved in a felonious venture that they can fairly be said either to have 'creat[ed]' the crime or to have 'coerc[ed]' the defendant's participation in it." *Id.* at 4–5 (quoting *United States v. Mosley,* 965 F.2d 906, 911–12 (10th Cir.1992)). This Court concludes that the doctrine should be reserved for occasions where a defendant demonstrates the latter. The remedy sought under this doctrine— dismissal of charges—is an extraordinary measure for a court and should be reserved for only those cases where justice could not be served by the government's pursuit of a conviction and where the dismissal can func-

tion as an effective means to deter such conduct by government agents in the future. Both of these interests are served only when a defendant can demonstrate a significant connection between the conduct complained of·and the charges he or she faces. In short, the remedy must fit the wrong.

Moreover, such a rule will not leave victims of outrageous government conduct that is unrelated to any pending charges without a means to seek relief from the courts. For example, money damages can be recovered för constitutional violations by federal officials. *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,* 403 U.S. 388, 389–90, 91 S.Ct. 1999, 2001–02, 29 L.Ed.2d 619 (1971). Also, in certain instances, the conduct of a federal official may invoke a court's "supervisory power," such as where there has been prosecutorial misconduct or other improper post-indictment activity. *See supra* note 6.

Finally, even aside from its remoteness from the fraud allegedly committed by Defendant, these allegations do not approach the requisite level of "egregious unacceptibility" required to meet the narrow requirements of the defense. The conduct is neither "fundamentally unfair nor offensive to principles of due process." *Panitz,* 907 F.2d at 1273. Even if this Court did not restrict its review of this conduct in terms of its relative contribution to the pending charges, none of the acts alleged here rises to such a level that would warrant the drastic remedy of a dismissal of all charges. Therefore, regardless of which analysis this Court were to pursue on this motion, the allegations presented fail to reach the minimum threshold that would entitle Defendant to an evidentiary hearing.

### C. The Motion to Suppress

 Defendant asserts the outrageous government conduct doctrine, not only as a defense, but also a basis for an order suppressing certain statements by Defendant.[8]

---

7. ·According to the indictment, Defendant provided false statements and a false social security number on applications submitted in October 1989, and March and May of 1990.

8. Defendant makes a argument based strictly upon "voluntariness" in his brief on the Motion to Dismiss or Suppress. However, in his Memorandum in Support of Supplemental Motion for Reconsideration, Defendant goes beyond asking

However, since the doctrine of outrageous conduct is normally associated with overinvolvement of government in the commission of a crime, the appropriate remedy is a dismissal of the charges, rather than suppression of specific evidence. It appears, however, from Defendant's brief that he argues that, due to Dox's conduct, the statements provided by Defendant to Dox were involuntary in nature. This argument actually proceeds under a self-incrimination, rather than due process, analysis. Accordingly, this Court will deny Defendant's Supplemental Motion for Reconsideration on the basis that Defendant has not made an adequate showing of outrageous government conduct and, even if he had, such conduct would not serve as a proper basis to exclude evidence. The issue of the voluntariness of the specific statements, however, will be addressed in the Court's disposition of the remaining portion of the motion to suppress, which is under advisement with this Court.

### III. CONCLUSION

Accordingly, Defendant's Motion for Reconsideration and Supplemental Motion for Reconsideration are *DENIED*.

So *ORDERED*.

that certain statements be excluded on the basis that they were involuntarily obtained. In the more recent brief, Defendant asks this Court to suppress all evidence derived from information supplied by Susan Bouchard as a confidential informant, which essentially amounts to all of the government's incriminating evidence. The basis of this request is that, prior to early March, 1995, Defendant claims that he had no idea of the extent to which Susan Bouchard had cooperated with Dox in his investigation of Defendant. This is clearly a discovery matter and Defendant will not be permitted to annex this dispute onto his earlier motion to suppress.