**UNITED STATES of America**

v.

**Peter BOUCHARD, Defendant.**

**Crim. No. 94–54–P–C.**

United States District Court,
D. Maine.

May 8, 1995.

Frederick Emery, Asst. U.S. Atty., Portland, ME, for the Government.

Thomas Hallett, Portland, ME, for defendant.

### MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, Chief Judge.

Now before the Court is Defendant's Motion to Suppress (Docket No. 6). This motion was originally part of a combined Motion to Dismiss or Suppress, most of which this Court denied previously in an Order entered on March 1, 1995 (Docket No. 19).[1] In that Order, this Court reserved ruling on the

issue of whether certain statements by Defendant were obtained illegally and set the matter for an evidentiary hearing, which took place on March 16, 1995. Defendant alleges that the statements at issue were either involuntary, since they were made after Federal Bureau of Investigation ("FBI") Special Agent Ronald Dox ("Dox") threatened to have Defendant jailed for a probation violation unless Defendant confessed, or were induced by Dox's promises of leniency. In this Memorandum and Order, this Court addresses these allegations and disposes of the remaining issue in Defendant's Motion to Suppress.

### I. FACTS

In November 1986, while living in Massachusetts, Defendant pleaded guilty to a state charge of larceny by check. The state court imposed a sentence of probation, ordered Defendant to pay restitution, and, after Defendant failed to make such a payment, issued a warrant for his arrest based on his default. Defendant moved to Maine in 1987 and began seeing Susan Martel; eventually the two became engaged.

In July 1988, Dox began an investigation of Defendant arising from allegations made by Defendant's employer at the time, Insurance Services Group, that Defendant was embezzling funds. Dox contacted Defendant and requested that he come to FBI headquarters in Portland for questioning. On July 25, 1988, Defendant arrived at the FBI offices, accompanied by Ms. Martel. Transcript of March 16, 1995, Proceedings (hereafter "Tr.") at 175. While Martel waited, Dox and Defendant met in a room and discussed the allegations made by Defendant's employer. Tr. at 19. Defendant made various inculpatory statements, including information regarding false repair claims he had submitted. Government Exhibit (hereafter "GE") No. 2. Defendant also admitted that he had failed to pay the court-ordered restitution resulting from the 1986 Massachusetts conviction.

---

1. Defendant filed subsequently a Motion for Reconsideration (Docket No. 23) and Supplemental Motion for Reconsideration (Docket No. 27) of the March 1, 1995, Order. In a separate decision, this Court has considered all of Defendant's arguments raised on those motions and determined that its original ruling was correct. United States v. Bouchard, 886 F.Supp. 111 (D.Me. 1995).

Dox testified that Defendant was not in custody during this questioning and was, at all times, free to leave. Tr. at 21. Accordingly, no *Miranda* warnings were given.

In September 1989, Susan Martel, accompanied by her stepfather, Victor Martel, returned to the FBI offices with information and documentation suggesting that Defendant was maintaining a bank account under a false name. Tr. at 152, 192. Dox again contacted Defendant and requested that he come to the FBI offices to answer questions. According to the report Dox prepared after the meeting with Defendant, after initially denying these allegations, Defendant admitted that he maintained a bank account under the name "Peter Blanchard." Government Exhibit (hereafter "Govt. Ex.") 3. Defendant further admitted that the funds in that account represented a portion of the money he had misappropriated from Horace Mann Insurance, his employer at the time, through the filing of false claims. After explaining to Dox his method of misappropriation, Defendant offered to make full restitution to Horace Mann Insurance. Dox and Defendant went to Citibank that same day and Bouchard obtained a bank check totalling $20,-641.83, presumably the full balance of the account, payable to Horace Mann Insurance and turned it over to Dox. *Id.* That same day Defendant also admitted that, as a result of his conviction in Massachusetts, he had been using different social security numbers in order to obtain credit. *Id.* Again, Dox testified that at no time during this interview was Defendant under arrest. Tr. at 22.

The following month, Dox and Defendant had another exchange, this time in the parking lot of a self-storage facility in Westbrook, Maine. Dox was there to follow up on information provided by Susan Martel regarding a vehicle at the facility which had been reported stolen by Defendant and for which he had collected insurance proceeds. Tr. at 23. As Dox was examining and photographing the car to determine if it was, in fact, Defendant's car, Defendant pulled up with a car carrier. Defendant told Dox that the car was stolen in Boston and that he had submitted a claim for it to State Farm Insurance Company ("State Farm"). Govt. Ex. 4. Defendant alleged that although he recovered the car shortly thereafter, he did not report this to State Farm and he had planned to sell it. He told Dox that he no longer planned to sell the car and that he was at the storage facility with the carrier because he was going to turn the car in to the State Farm claims center. Dox then followed Defendant to State Farm when Defendant turned in the car. Defendant told Dox that he also planned to repay the entire amount of his claim, $12,330, and that he would obtain a loan for this purpose. Dox's report indicates that Dox specifically warned Defendant about providing false information on a credit application. Govt. Ex. 4.

Dox and Defendant met again in March 1991 at the Windham Police Department, where Defendant was detained after his arrest on the outstanding Massachusetts warrant. Dox instigated the arrest by contacting the Windham Police after having spoken with Massachusetts authorities who indicated a willingness to extradite Defendant. Tr. at 66. Dox claims that, although he had known since 1988 that Defendant had failed to pay the restitution portion of his sentence, he did not learn until March 1991 that there was an outstanding warrant for Defendant's arrest.[2]

---

2. The testimony was sharply conflicting on the point in time at which Dox learned of the outstanding warrant in Massachusetts. Dox testified several times that he could not remember when he first learned of the warrants and also acknowledged that, once he did know, it became his duty as a law enforcement officer to immediately notify Massachusetts authorities as to Defendant's location. Tr. at 181. By the end of the hearing, Dox appeared more confident in stating that he had no knowledge of Defendant's fugitive status until March 1991, just prior to contacting the Massachusetts authorities regarding extradition. Tr. at 188.

However, there are other statements in Dox's testimony and that of other witnesses which suggest that he probably knew about the warrant before 1991. Most notably, Dox admits that he had been in contact with the Massachusetts State Police regarding Defendant "on and off for a year," prior to March 1991, but claims that during that time, he did not learn that Defendant was a fugitive. Tr. at 68. "[Defendant] was not an FBI fugitive, I did not make inquiry." *Id.* Dox also admitted that it would be highly unusual for him to not check the National Crime Information Center database early in an investigation. He told the Court that it is possible that a year

Defendant was in custody during Dox's questioning on that date. Dox administered a *Miranda* warning and gave Defendant an "Interrogation; Advice of Rights Form," on which the warnings are written, for Defendant to read aloud and sign before questioning began.[3] Tr. at 28. After signing the form, Defendant made more inculpatory statements regarding the use of false social security numbers and specifically regarding the false information and social security number furnished by him on a Key Bank loan application, the subject of Counts I and II of the instant indictment. Govt. Ex. 5.

Defendant contacted Dox a few days later, on or about March 27, 1991, asking that a meeting be set up between himself and Dox at which Ms. Martel and Defendant's minister could also be present. Tr. at 31. When Dox inquired whether Defendant had an attorney, Defendant responded that he had retained counsel regarding the charges in Massachusetts but would not be hiring anyone regarding the FBI investigation. *Id.;* Govt. Ex. 8. Defendant followed up with two letters, which were hand-delivered to Dox at FBI offices. Neither letter is dated, but Dox testified that he received them within a few days of the March 27 phone conversation. Tr. at 33. One letter provides some additional details regarding the use of a false social security number, a fraudulent insurance claim for damage done to his car, and indicates Defendant's desire to "to close this part of [his] life." Govt. Ex. 9. The second letter requests guidance regarding hiring an attorney and paying his restitution in Massachusetts. Govt. Ex. 10.

As Defendant had requested, Dox, Defendant, and Ms. Martel met at FBI offices on March 29, 1991.[4] Defendant was provided with another "Interrogation; Advice of Rights" form. Dox testified that, although Defendant was not in custody during this interview, it was FBI policy to furnish *Miranda* warnings in each interview *subsequent to the one in which the warnings have been provided.* Tr. at 38. Defendant told Dox that he was aware of his rights and signed the form, which Ms. Martel also signed as a witness. Govt. Ex. 12. Defendant made several incriminating statements during the hour-long interview in which he discussed the earlier instances of embezzlement while he was employed at insurance companies and fraudulent insurance claims he had submitted on his own vehicles. Govt. Ex. 11. Ms. Martel was present throughout the interview but did not participate.

A few weeks later, Dox contacted Defendant and requested that he return to the FBI

passed between the time he learned of the warrants and the time he contacted Massachusetts regarding extradition. Tr. at 183. Furthermore, both Victor and Susan Martel specifically remember being told by Dox that Defendant was the subject of an outstanding warrant. Tr. at 116, 149.

Although this Court is reluctant to believe that Dox had *no* knowledge prior to March 1991 that Defendant was a fugitive, this conclusion does not alter the Court's overall conclusion that the statements challenged in this motion were not the product of coercion. The evidence on this issue may indicate lax, or even designedly clever investigative work, but this Court finds no direct connection between Dox's failure to act promptly on the outstanding warrants and the circumstances of Defendant's inculpatory statements.

**3.** The advice-of-rights form, which was signed by Defendant on three occasions, provides,

*YOUR RIGHTS*

Before we ask you any questions, you must understand your rights.

You have the right to remain silent.

Anything you say can be used against you in court.

You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

*WAIVER OF RIGHTS*

I have read this statement of my rights and I understand what my rights are. I am willing to make a statement and answer questions. I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made to me and no pressure or coercion of any kind has been used against me.

/s/ Peter Bouchard.

Govt. Ex. 6.

**4.** Dox did not permit Defendant's minister to be present. Tr. at 34.

offices to answer additional questions regarding the various matters that were discussed on March 29. Tr. at 39. Defendant returned to FBI offices on April 19, 1991, where he was again provided with an advice-of-rights form which he signed. Tr. at 39–49; Govt. Ex. 15. During that meeting, Dox and Defendant discussed the March 1990 loan from Citibank, which is the subject of Counts III and IV of the present case. Govt. Ex. 14. Defendant admitted to providing a false social security number and false information regarding his employment and salary on the loan application.

Defendant had a final, official meeting with Dox on April 23, 1991. That meeting was set up by Dox for Defendant to submit to a polygraph examination because Dox was not satisfied that Defendant was entirely truthful in some of the information he was providing. Tr. at 105. Another FBI Special Agent, Thomas Donlan, III ("Donlan"), was present to administer the examination. Donlan and Defendant went into a room, without Dox, where Donlan provided Defendant with an advice-of-rights form which Defendant signed. Before Donlan could administer the polygraph test, however, Defendant provided a written statement, which he signed that day in the presence of Dox and Donlan. Govt. Ex. 16. The statement was in reference to a 1990 insurance claim in which Defendant alleged that his car had been stolen in Boston. Defendant told Dox and Donlan that the car had, in fact, been stolen, but that Defendant had been trying to get rid of it and, for that reason, left it on a side street with the windows half down and the doors unlocked.

More than three years later, Defendant was indicted for the charges he presently faces. FBI Special Agent James G. Osterrieder ("Osterrieder") testified that, pursuant to the indictment, he arrested Defendant at his home on October 20, 1994. When Osterrieder initially took Defendant into custody, he told Defendant that was under arrest and handcuffed him but did not advise Defendant of his *Miranda* rights at that time. As Osterrieder drove Defendant to the United States Marshal's office in Portland, and after a previously silent car ride, Defendant said

spontaneously, "I did it. I admit it that I did it and I wanted to plead guilty to it several years ago." Tr. at 7. Defendant also stated that he "thought it was taken care of a number of years earlier." Tr. at 12. Osterrieder replied, "[D]on't say anything to me because if you do, I'm going to use it against you.... [I]n fact, let me give you your rights." *Id.* At that point Osterrieder did provide Defendant with *Miranda* warnings although Defendant stated that he knew his rights and "didn't need to hear them." *Id.*

## II. DISCUSSION

As a preliminary matter, this Court notes that the evidence presented during the evidentiary hearing in this matter did not suggest that any government agent failed to properly administer *Miranda* warnings during any instance of custodial interrogation. The statements made by Defendant on July 25, 1988, September 14, 1989, and October 19, 1989, were made while Defendant was not in custody and, therefore, the government agent conducting the interview was not required to administer *Miranda* warnings. *Bryant v. Vose*, 785 F.2d 364, 366 (1st Cir. 1986). The statements made on March 25 and 29, 1991, and on April 19 and 23, 1991, were made after Defendant had been advised of his *Miranda* rights and, on each of those dates, Defendant signed an "Interrogation; Advice of Rights" form, waiving his rights. The statements made during a phone call on March 27, 1991, and in two undated letters sent in late March of 1991, were not the result of custodial interrogation since Defendant was not "in custody" and he initiated the contact with law enforcement officials. Finally, the October 20, 1994, statement made after Defendant's arrest and during transport to the United States Marshal's holding facility in Portland, Maine, was not in response to any interrogation by the arresting officer. Accordingly, this Court concludes that the statements that are the subject of the Motion to Dismiss were not obtained in violation of the "prophylactic" rules established in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *See Michigan v. Tucker*, 417 U.S. 433, 444–46, 94 S.Ct. 2357, 2363–65, 41 L.Ed.2d 182 (1974).

Defendant, however, bases his Motion to Suppress primarily on a theory of "voluntariness." That is, he seeks to prove that the conduct of Special Agent Dox had the effect of creating psychological coercion, compelling Defendant to make these statements. Specifically, Defendant alleges that the statements made prior to March 1991 were provided under the threat of being "turned in" to the Massachusetts authorities on the outstanding warrant. Defendant further alleges that the remaining inculpatory statements were made in response to Dox's promises of leniency. The evidence produced at the hearing, however, failed to support any of these assertions.

■ The Court may not admit a defendant's involuntary statements against him at trial. The use of such statements at trial, for any purpose, amounts to a denial of a defendant's due process rights. *New Jersey v. Portash*, 440 U.S. 450, 459, 99 S.Ct. 1292, 1297, 59 L.Ed.2d 501 (1979); *Mincey v. Arizona*, 437 U.S. 385, 398, 98 S.Ct. 2408, 2416, 57 L.Ed.2d 290 (1978). The burden rests at all times with the government to prove by a preponderance of the evidence that a statement was voluntarily provided by a defendant. *United States v. Jackson*, 918 F.2d 236, 241 (1st Cir.1990). The inquiry for this Court, then, is "whether the will of the defendant [was] overborne so that the statement was not his free and voluntary act, and that question [is] to be resolved in light of the totality of the circumstances." *Bryant*, 785 F.2d at 367–68.

■ The Supreme Court has recognized that various forms of "psychological coercion" may render a statement involuntary. For a statement or confession to be "voluntary," it "must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542–43, 18 S.Ct. 183, 186–87, 42 L.Ed. 568 (1897). Although *Bram* remains good law, it is clear that courts must look beyond the mere presence of a threat or promise to determine whether, in the totality of the

circumstances, such a threat or promise actually operated to overbear the defendant's will. *Jackson*, 918 F.2d at 242. *See also United States v. Pinto*, 671 F.Supp. 41, 57 (D.Me.1987) (citations omitted) ("[T]he more recent decisions consider a variety of factors [to determine the 'voluntariness' of a statement], including the nature of the promise, the context in which the promise was made, the characteristics of the individual defendant, whether the defendant was informed of his rights, and whether counsel was present.")

■ The evidence provided at the hearing regarding certain statements not preceded with *Miranda* warnings [5] does not establish that such statements were involuntary. On each occasion, the *Miranda* warnings were not administered since the statements were not provided in the context of custodial interrogation. Defendant's theory requires this Court to accept as true his allegations that Special Agent Dox held the threat of turning Defendant over to Massachusetts law enforcement authorities "over his head" in an attempt to control Defendant and extort these admissions from him. Although it appears likely that Agent Dox did know of the outstanding warrant well before he acted on it, Defendant failed to make the critical link between this fact and the inculpatory statements made by Defendant. None of the summaries of the meetings between Dox and Defendant, except for the initial July 1988 meeting, provides any mention of the Massachusetts charges at all. Defendant was not able to obtain any admissions from Dox on this point, nor did any of Defendant's witnesses testify regarding the supposed threat.

■ With respect to the statements provided in March and April of 1991, after Defendant had waived his *Miranda* rights, the Government must demonstrate that Defendant's waiver was provided "voluntarily, knowingly and intelligently." *Miranda*, 384 U.S. at 444, 86 S.Ct. at 1612. Since Defendant has not alleged that he did not understand his rights or that the rights were improperly administered, the focus is on the

---

5. The statements in this category were provided on July 25, 1988; September 14, 1989; October 19, 1989; two letters and a telephone call on or about March 27, 1991; and October 20, 1994.

"voluntariness" of the waiver. Therefore, this Court must examine the evidence to determine if both the statements and the waivers were provided to government agents voluntarily or whether, as Defendant alleges, Dox's assurances of leniency rendered any waiver involuntary.

Defendant has failed to demonstrate to this Court that he provided any of the statements at issue in exchange for promises of leniency. While Defendant did present some evidence on this issue, largely through the testimony of his wife, it sharply conflicted with and, in the end, failed to rebut, the government's evidence. Again, the summaries prepared by Agent Dox make no mention of any discussion between Dox and Defendant regarding any possible penalties for the criminal activity to which Defendant admitted. It appears from all the evidence that Defendant provided inculpatory information to Dox on the first two occasions, July 1988 and September 1989, only after it was made clear to him that Dox had evidence of criminal activity and not in response to any promise extended by Dox.

More significant, however, are the inconsistencies in the testimony of Susan (Martel) Bouchard, now Defendant's wife. Defendant sought to establish Dox's promises through her testimony by having her recall statements made by Dox to her or to Defendant directly in her presence. The gist of this testimony is that Dox told her and the Defendant that if Defendant would "come clean" or confess all criminal activity, Dox would ensure that Defendant would not do any jail time. Her testimony, however, provided few specifics regarding these promises, and further examination of the testimony demonstrates inconsistencies suggesting that she may have misunderstood some of Dox's remarks.

For example, Susan Bouchard alleges that, during her conversations with Dox in the months preceding Defendant's March, 1991 arrest,

[Dox] indicated that we would be, or Peter would be getting a target letter, that it was just a formality, that it would—he probably would have probation, possibly a fine, he couldn't say exactly what it would be, just that he would not have to do jail time and he worked closely with [Assistant United States Attorney] Emery, they would work it out.

Tr. at 119. However, a few moments later, when recalling the discussion during the March 29, 1991, meeting which she attended, Susan Bouchard stated that Defendant indicated that he might want an attorney and that "Mr. Dox indicated that if [Defendant] got an attorney that [Dox] would have to get Emery involved and he couldn't guarantee no jail time." Tr. at 121. She also testified that this March 29 discussion was the first time she had heard Dox refer to AUSA Emery. These statements are patently inconsistent and suggest that Ms. Bouchard may not have entirely understood Dox's remarks on these occasions.[6]

In short, absent any other indicia of reliability to support the testimony of this interested witness, this Court concludes that Defendant has failed to demonstrate that any threat or promise was made by Dox or any other government agent. Moreover, even if such a promise or threat could be inferred from any of Dox's statements or conduct, the "totality of the circumstances" clearly negates any finding that such statements by Dox could amount to psychological coercion overriding Defendant's free will. Defendant has never alleged that Dox claimed to have the absolute power or authority to control precisely what punishment Defendant would face. This can be contrasted with the facts presented to this Court in *Pinto* in which the arresting officer stated to the defendant there "that he had enough information to charge defendant with attempting to traffic in narcotics. [Officer] Hall advised defendant to cooperate, telling him that he was the

---

**6.** The testimony was also confusing regarding how Susan Martel portrayed these "promises of leniency" to her stepfather, Victor Martel. He referred on his cross-examination to her statements to him indicating a belief on her part that Defendant "probably" would not go to jail. On redirect, however, Martel clarified that Ms. Martel was more confident than he (Martel) was regarding the prospects of Defendant avoiding jail time and that the use of the word "probably" was most likely his own words, not the manner in which she had described it. Tr. at 150, 155.

128

'one friend' that defendant had, and that he was the one person standing between defendant and a long jail term." *Pinto*, 671 F.Supp. at 42 (footnotes omitted). In all but two of the situations at issue here, Defendant was not in custody when he provided inculpatory statements. On three of the occasions in question, Defendant had been administered his *Miranda* rights and had waived them prior to making any statements. This Court cannot overlook the fact that Defendant is an individual with sixteen years of education and at least one previous exposure to the workings of the criminal justice system. Accordingly, he can be expected to understand the operation of his constitutional rights in the system, including his right to remain silent, his knowledge of which he acknowledged on at least two occasions.

Finally, Defendant has not provided evidence of any other factor suggesting the presence of coercion of any kind. *See United States v. Lawrence*, 889 F.2d 1187, 1190 (1st Cir.1989) (providing recitation of fact patterns which suggest involuntariness). It may have been that Defendant hoped Dox would reward Defendant's forthrightness by not contacting Massachusetts authorities or by putting in a good word for him to the AUSA, but that hope was not improperly induced by anything Dox said to him.

### III. CONCLUSION

Accordingly, Defendant's Motion to Suppress is *DENIED*.

So *ORDERED*.